**BLANK ROME LLP**
Gregory M. Bordo (SBN 156147)
Greg.Bordo@BlankRome.com
Christopher J. Petersen (SBN 251439)
Chris.Petersen@BlankRome.com
Craig N. Haring (SBN 314100)
Craig.Haring@BlankRome.com
2029 Century Park East, 6th Floor
Los Angeles, CA  90067
Telephone:     424.239.3400
Facsimile:     424.239.3434

Attorneys for Plaintiff
LIFELINE LEGACY HOLDINGS LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| LIFELINE LEGACY HOLDINGS LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br><br>    v.<br><br>OZY MEDIA, a Delaware corporation; SAMIR RAO, an individual; CARLOS WATSON, an individual,<br><br>        Defendants. | Case No. 5:21-cv-07751-BLF<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS, VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25401**<br><br><br>**DEMAND FOR JURY TRIAL** |

163056.00601/129061142V.1

Plaintiff LifeLine Legacy Holdings LLC ("LifeLine" or "Plaintiff") hereby alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action concerns violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC").

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to the written agreements at issue, each of which contain provisions requiring that the venue of any litigation between the parties shall be this district and pursuant to Section 27(a) of the Exchange Act and 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of federal securities laws occurred within this district.

## SUMMARY OF CLAIMS

4.      In February and May of 2021, Defendant Ozy Media ("Ozy Media" or the "Company") solicited investments from LifeLine which culminated in the execution of two written stock purchase agreements.  Pursuant to these agreements, Ozy Media represented and warranted, among other things, that: (a) at the time the agreements were executed the Company was unaware of the pending resignation or termination of any key employee; (b) since December 31, 2018, there had not been any failure to conduct business in the ordinary course; (c) since December 31, 2018, there had been no condition or event of any character that might result in a material adverse effect on the Company; and (d) since December 31, 2018, there had been any investigation into the Company by any government agency.

5.      While soliciting LifeLine's investments and at the time of execution of the stock purchase agreements, Ozy Media failed to inform LifeLine that on February 2, 2021, the Company's Co-Founder, Director and Chief Operating Officer, Samir Rao ("Rao"), on a call with investment

1

firm Goldman Sachs wherein the Company was seeking a $40 million investment from Goldman Sachs, impersonated an executive of YouTube and misrepresented viewership of Ozy Media programming shown on YouTube.  As a result of that incident, Goldman Sachs refused to make a contemplated $40 million investment in Ozy Media leading the Company's executives to conclude that if they disclosed the incident and its consequences to LifeLine, LifeLine would similarly refuse to invest.  To avoid the loss of yet another potential investor, the Company kept the incident hidden from LifeLine thereby rendering the written representations set forth in the stock purchase agreements false or misleading in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated pursuant thereto.

## THE PARTIES

6.      Plaintiff, LifeLine Legacy Holdings LLC, is a Delaware limited liability company with its principal place of business located in Beverly Hills, California.

7.      Defendant, Ozy Media, is incorporated under the laws of the state of Delaware and its offices and principal place of business are located in Mountain View, California.

8.      Defendant Rao is an individual residing in Palo Alto, California, and is a Co-Founder of Ozy Media and, at relevant times referred to herein, served as Chief Operating Officer of Ozy Media and was a member of its Board of Directors.

9.      Defendant Carlos Watson ("Watson") is an individual residing in Mountain View, California, and is a Co-Founder of Ozy Media and, at all relevant times referred to herein, served as the Chief Executive Officer of Ozy Media and was a member of its Board of Directors.

## THE ALLEGATIONS

### *Ozy Media's Solicitations of Investments from LifeLine*

10.     Ozy Media is a digital media company specializing in, among other things, news, podcasts, festivals, and television/feature film productions.   The Company was founded in September 2013 by Watson and Rao.

11.     In late 2020 and early 2021, Ozy Media sought to raise funds from, among others, private investors.  LifeLine was one of the investors targeted by Ozy Media and, more specifically,

SECOND AMENDED COMPLAINT
CASE NO. 21-CV-07751-BLF

163056.00601/129061142V.1

1   by its Co-Founder, Director and Chief Executive Officer, Watson, and its Co-Founder, Director and

2   Chief Operating Officer, Rao.

3        12.    Prior to 2020, a principal of LifeLine had previously worked with and had developed

4   a professional relationship with Watson.   At no time during their years long prior professional

5   relationship had the principal of LifeLine, and signatory to the stock purchase agreements on behalf

6   of LifeLine, had any reason to suspect that Watson was anything but a truthful person.

7        13.    Starting in late 2020 and continuing through early February 2021, Watson and Rao

8   personally solicited investments in Ozy Media from LifeLine in what Watson and Rao described as a

9   forthcoming "Series D" round of funding for the Company that would be led by one or more well-

10  known institutional investors intending to invest tens of millions of dollars in the Company.   During

11  correspondence with LifeLine regarding the potential investment, Watson and Rao informed

12  LifeLine that the "Series D" round of funding would be based on a $300 million pre-money

13  valuation of the Company and the price of each "Series D" share in the Company would be

14  approximately $7.00.

15       14.    On February 15, 2021, Watson informed LifeLine, for the first time, that Ozy Media

16  was not moving forward with the "Series D" round of funding.   Watson told the principals of

17  LifeLine that LifeLine's investment in the Company was "important" and that the Company valued

18  LifeLine as an investor.   Based thereon, Watson informed LifeLine's principals that the Company

19  would explorer other investment options with LifeLine.

20       15.    On or about February 17, 2021 – just days after Rao's misconduct on February 2,

21  2021 and the resulting refusal by Goldman Sachs to make a substantial $40 million investment in

22  Ozy Media – Watson informed the principals of LifeLine that he had "great news" for LifeLine.

23  Specifically, Watson informed LifeLine that he had received authority from the Company's Board of

24  Directors to "reopen" the "Series C" round of funding to specifically accommodate an immediate

25  multi-million investment from LifeLine.   Watson and Rao informed LifeLine that the "Series C"

26  round of funding (which was based on a $125 million pre-money valuation of the Company and a

27  price of $5.19 per "Series C" share) had closed in September 2019, but that if LifeLine acted quickly

28

**SECOND AMENDED COMPLAINT**
**CASE NO. 21-CV-07751-BLF**

163056.00601/129061142V.1

it would be given the opportunity to purchase "Series C" shares of the Company in February 2021 at the share price given to investors in September 2019.

16.     At the time, LifeLine viewed this as an opportunity to invest in Ozy Media based on a lower valuation and believed it was afforded the opportunity to do so based on its prior professional relationship with Watson and because, as expressed to LifeLine by both Watson and Rao, the Company desired to build relationships with LifeLine's high-profile clientele in order to benefit the Company's operations going forward.  At the time, LifeLine had no reason to suspect that it was afforded the opportunity to invest in the Company through the "reopened" "Series C" round of funding because the Company needed investors to replace the $40 million investment from Goldman Sachs that it had just lost days earlier, or because the Company was concerned that investors, like LifeLine, would refuse to invest if Rao's misconduct was disclosed.

17.     From late 2020 through mid-February 2021, both Watson and Rao, as officers and directors of Ozy Media, personally solicited an investment from LifeLine and encouraged it to invest in the Company, including without limitation by way of electronic correspondence and telephone calls on February 10, 14, 15, 16, 17 and 18, 2021.  During the solicitation of LifeLine's investment, both Watson and Rao represented to LifeLine through their words and actions that, as officers and directors of Ozy Media, their duties with the Company included solicitation of investments in the Company and that they were authorized to solicit investments on behalf of the Company, including the investment from LifeLine.

18.     As discussed more fully below, in late February 2021, LifeLine agreed to make its first investment in Ozy Media in the amount of $2,000,000.  In May 2021, LifeLine made a second investment in Ozy Media in the amount of $250,000.

### The Preceding Impersonation Incident

19.     In early 2021, the well-known investment firm Goldman Sachs was considering making a $40 million investment in Ozy Media; an investment that would not only have had a material impact on the Company's financial condition but would indeed have been transformative for the Company.  In connection with the potential Goldman Sachs investment, a call was held on

February 2, 2021, during which call the Company, through Rao, engaged in fraudulent, deceptive and illegal conduct when Rao, impersonated an executive of YouTube and misrepresented viewership of Ozy Media programming shown on YouTube (the "Impersonation Incident").

20.    When the Impersonation Incident was later uncovered not only did Goldman Sachs refuse to invest in the Company but the Company also became subject to various law enforcement investigations, including by Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ").

21.    Additionally, as a result of the incident, Rao – a co-founder, key officer and director of the Company – was asked to resign from the Company.

***Lifeline's Investments and the Stock Purchase Agreements***

22.    As noted above, Ozy Media solicited and encouraged investments from LifeLine by way of electronic correspondence and telephone calls starting in late 2020 and continuing on February 10, 14, 15, 16, 17 and 18, 2021.

23.    LifeLine agreed to invest in Ozy Media by way of the "reopened" Series C round of funding.  On February 24, 2021, LifeLine and Ozy Media entered into a Series C Preferred Stock Purchase Agreement dated as of September 13, 2019 (the "Series C SPA"), pursuant to which LifeLine agreed to and did invest $2 million in the Company at a price of $5.19 per share.  The Series C  SPA was sent to LifeLine by Rao via email.  A copy of the Series C SPA is attached hereto as **Exhibit 1**.  The Series C SPA was signed by Watson on behalf of Ozy Media as its "CEO".

24.    The Series C SPA contained the following material representations made by Ozy Media:

   a.   Section 3.6(h): "[S]ince the Balance Sheet Date [the fiscal year ended December 31, 2018 and the six-month period ended June 30, 2019], there has not been: … (h) any resignation or termination of employment of any officer or key employee of the Company; and the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such officer or key employee;"

5

b.  Section 3.6(m): "[S]ince the Balance Sheet Date [the fiscal year ended December 31, 2018 and the six-month period ended June 30, 2019], there has not been: … (m) any failure to conduct business in the ordinary course, consistent with the Company's past practices;"

c.  Section 3.6(n): "[S]ince the Balance Sheet Date [the fiscal year ended December 31, 2018 and the six-month period ended June 30, 2019], there has not been: … (n) to the Company's knowledge, any other event or condition of any character that might result in a Material Adverse Effect; … ."

d.  Section 3.12: "There are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."

25.     Section 3.1 of the Series C SPA defines "Material Adverse Effect" as, "[t]he Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's financial condition or business as now conducted".  Thus, any incident, condition or circumstances that could result in the Company losing its qualification to conduct business in any jurisdiction and a resulting financial impact would be an incident having a material adverse effect on the Company.

26.     LifeLine reviewed the Series C SPA prior to signing it and relied on the truthfulness of the representations set forth in the Series C SPA, including those representations at Sections 3.6(h), (m) and (n) and 3.12, in making its decision to invest in Ozy Media.  In making investments, it is important to LifeLine and its clientele that the companies in which LifeLine invests are truthful in their representations to investors, not engaged in any business out of the ordinary course or inconsistent with past practices, and not being investigated by any regulatory agencies because such conduct is likely to have a negative impact on the reputation of the company in which LifeLine is making an investment and, as such, a negative impact and reputational damage to LifeLine and its

6

163056.00601/129061142V.1

clientele.   LifeLine would not have executed the Series C SPA if it had known that the representations made by the Company in Sections 3.6(h), (m) and (n) and Section 3.12 were false or misleading.

27.   Starting on or about April 6, 2021, and continuing through May 2021, Ozy Media through Watson and Rao solicited further investments from LifeLine and its clients.

28.   On May 9, 2021, Ozy Media, through Rao represented in writing to LifeLine that Alphabet or one of its Google affiliates was leading the Series D financing by investing approximately $30 million into the Company.  These representations were repeated and affirmed to LifeLine's principals by Watson during several telephone conversations between May 9 and 13, 2021.

29.   On or about May 13, 2021, LifeLine entered into a Series D Preferred Stock Purchase Agreement (the "Series D SPA"), which was sent to LifeLine by Rao, via email, pursuant to which LifeLine agreed to and did purchase $250,000.00 of Series D Preferred Shares in Ozy Media at a price of $7.79 per share.  A true and correct copy of the Series D SPA is attached hereto as **Exhibit 2**.  The Series D SPA was signed by Watson on behalf of Ozy Media as its "CEO".

30.   The Series D SPA included the following material representations by Ozy Media:

a.   Section 3.6(h): "[S]ince the Balance Sheet Date [the fiscal year ended December 31, 2020 and the three-month period ended March 31, 2021], there has not been: … (h) any resignation or termination of employment of any officer or key employee of the Company; and the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such officer or key employee;"

b.   Section 3.6(m): "[S]ince the Balance Sheet Date [the fiscal year ended December 31, 2020 and the three-month period ended March 31, 2021], there has not been: … (m) any failure to conduct business in the ordinary course, consistent with the Company's past practices;"

7

     c.  <u>Section 3.6(n)</u>: "[S]ince the Balance Sheet Date [the fiscal year ended December 31, 2020 and the three-month period ended March 31, 2021], there has not been: … (n) to the Company's knowledge, any other event or condition of any character that might result in a Material Adverse Effect; … ."

     d.  <u>Section 3.12</u>: "There are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."

31.    The representations made in Sections 3.6(h), 3.6(m), 3.6(n) and 3.12 of the Series C SPA and the Series D SPA are collectively referred to hereinbelow as the "Representations". The Series C SPA and the Series D SPA are sometimes collectively referred to hereinbelow as the "SPAs".

32.    Section 3.1 of the Series D SPA defines "Material Adverse Effect" as, "[t]he Company is presently qualified to do business as a foreign corporation in each jurisdiction where the failure to be so qualified could reasonably be expected to have a material adverse effect on the Company's financial condition or business as now conducted". Thus, any incident, condition or circumstances that could result in the Company losing its qualification to conduct business in any jurisdiction and a resulting financial impact would be an incident having a material adverse effect on the Company.

33.    LifeLine reviewed the Series D SPA prior to signing it and relied on the truthfulness of the representations set forth in the Series D SPA, including those Representations at Sections 3.6(h), (m) and (n) and 3.12 in making its decision to invest in Ozy Media. In making investments, it is important to LifeLine and its clientele that the companies in which LifeLine invests are truthful in their representations to investors, not engaged in any business out of the ordinary course or inconsistent with past practices, and not being investigated by any regulatory agencies because such conduct is likely to have a negative impact on the reputation of the company in which LifeLine is making an investment and, as such, a negative impact and reputational damage to LifeLine and its

8

clientele. LifeLine would not have executed the Series D SPA if it had known that the Representations made by Ozy Media in Sections 3.6(h), (m) and (n) and Section 3.12 were false or misleading.

34.    Based on the written representations regarding Ozy Media as set forth in the Series C SPA and the Series D SPA, LifeLine's prior professional relationship with Watson, and representations by Watson and Rao that institutional investors other than Goldman Sachs were positioning to make substantial investments in the Company, LifeLine had no reason to suspect that the Representations made by Ozy Media in the SPAs were false or misleading.

***Defendants' Failures to Disclose the Impersonation Incident and its Consequences Rendered the Company's Representations in the SPAs False or Misleading***

35.    At all times while Defendants solicited investments from Lifeline and while the Series C SPA and Series D SPA were being negotiated and executed, Defendants, and each of them, failed to disclose to LifeLine: (1) that the Impersonation Incident had occurred; (2) that, as a result, Rao, a co-founder, key executive and director of the Company had been asked to resign; (3) that investigations into the Company had been commenced by the SEC and DOJ; and, (4) that Goldman Sachs had refused to invest in the Company because of the Impersonation Incident.

36.    The foregoing circumstances, whether taken individually or collectively, were clearly contrary to the Representations.

37.    By way of Section 3.6(h) of the SPAs, Ozy Media represented to LifeLine that, since December 31, 2018, there had not been any resignation or termination of any officer or key employee of the Company, nor was there any such resignation or termination pending.  By failing to disclose that Rao's forced resignation was pending or had already occurred, the Company rendered the representation made in Section 3(h) of the SPAs not only misleading, but actually false.

38.    In Section 3.6(m) of the SPAs, Ozy Media assured LifeLine that between December 31, 2018 and March 31, 2021 there had been no failure by the Company to conduct business in the ordinary course, consistent with the Company's past practices.  Clearly, the Chief Operating Officer and a director of the Company impersonating an executive of another company in order to solicit a

9

$40 million investment from Goldman Sachs cannot be considered ordinary course of business for any company.  Moreover, as discussed more fully below, following the public revelation of the Impersonation Incident, Watson publicly stated that such actions were not reflective of how the Company conducted business.

39.    Section 3.6(n) of the SPAs contained a representation made by Ozy Media to Lifeline that, during the period of  December 31, 2018 through March 31, 2021, there had been no event of condition of any character that "might" result in a "Material Adverse Effect" to the Company. Given the blatant illegality of the Impersonation Incident, there can be no doubt that the Impersonation Incident was an event that could possibly constitute a "Material Adverse Effect" on the Company, especially since the Impersonation Incident led directly to investigations into the Company by the SEC and DOJ and, as set forth below, an initial decision by the Company to cease operations.

40.    Section 3.12 of the SPAs contains the following express representation: "There are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."  LifeLine is informed and believes and, based thereon, alleges that as a result of the Impersonation Incident, investigations of Ozy Media were commenced, and are presently ongoing, by the SEC and DOJ and that Defendants, and each of them, were aware of said investigations at the times LifeLine agreed to invest in the Company.  Surely, law enforcement investigations into fraudulent conduct in connection with the solicitation of investments could and likely would have direct adverse impact on the Company's qualification to conduct business and, therefore, on the financial condition of the Company.

41.    Both Watson and Rao engaged in numerous communications with LifeLine regarding its potential investment in Ozy Media (e.g., February 10, 14, 15, 16, 17 and 18, April 6, May 9 and 13, 2021) *after* Rao's fraudulent conduct had occurred and *before* LifeLine executed the Series C SPA (February 24, 2021) or the Series D SPA (May 13, 2021).

163056.00601/129061142V.1

42.     At no time before or during the time that Ozy Media solicited investments from LifeLine and entered into the SPAs with LifeLine did the Defendants, or any of them, disclose to LifeLine the Impersonation Incident.  Not only did Defendants fail to disclose the fact of Rao's misconduct to LifeLine before it invested in Ozy Media, they each failed to disclose any of the consequences resulting from that misconduct, including that the Company lost the $40 million investment that Rao and Watson had spent months soliciting, that the Company asked Rao to resign as a result of his misconduct, and that the SEC and DOJ had opened investigations into Ozy Media and its business operations.  The undisclosed Impersonation Incident and each of these undisclosed consequences were directly contrary to representations made by Ozy Media in the SPAs executed by LifeLine and Ozy Media memorializing the terms of LifeLine's investments.

43.     By omitting material information rendering written representations made to LifeLine by Ozy Media in connection with LifeLine's investments false or misleading, Defendants violated Section 10(b) of the Exchange Act, SEC Rule 10b-5, and California Corporations Code § 25401.

44.     Had LifeLine known the foregoing facts it would never have invested in Ozy Media and LifeLine is now, therefore, entitled to rescission of its investments and damages.

***Defendants' Scienter***

45.     The nature and sequence of the relevant events emanating from the Impersonation Incident establish that the decision by Watson and Rao not to disclose the Impersonation Incident and the resulting consequences prior to LifeLine's investments in the Company was at worst intentional and at best reckless.

***Temporal Factors***

46.     Both Watson and Rao engaged in a series of communications with LifeLine regarding its potential investment in Ozy Media starting in late 2020 and through early February 2021.  Those communications focused, exclusively, on a forthcoming "Series D" round of funding for the Company.  On or about February 15, 2021 – *just days after* the Impersonation Incident had occurred and *before* LifeLine executed the Series C SPA and made its first investment of $2 million in the Company (February 24, 2021) – Watson and Rao introduced a new investment structure to LifeLine

11

by way of "reopening" the "Series C" round of funding to accommodate an immediate and "important" multi-million dollar investment by LifeLine.

47.    Defendants were all aware of the Impersonation Incident the day that it occurred and before LifeLine made its first investment in Ozy Media by way of the Series C SPA.  There is no doubt, therefore, that such an adversely impactful occurrence (which Watson described as "horrific") would have been top of mind for Defendants at the very time they were soliciting investments from LifeLine and executing the SPAs containing the Representations that were rendered false or misleading before the ink was dry on the agreements.   The very proximity in time of the Impersonation Incident to the Company suddenly "reopening" the Series C funding for LifeLine 17 months after it had closed to accommodate an immediate and "important" investment by LifeLine, along with LifeLine's execution of the Series C SPA is prima facie evidence that Ozy Media, Watson and Rao intentionally hid the Impersonation Incident from LifeLine so as to secure LifeLine's multi-million dollar investment and avoid the loss of another "important" investment in the Company.

48.    Given that the Impersonation Incident was known to Defendants in advance of when the SPAs were signed, and given that the incident was so "horrific" and blatantly contrary to the Representations, the only reasonable conclusion is that, when making the Representations, Defendants, and each of them, intentionally failed to disclose the Impersonation Incident and the resulting consequences to LifeLine.

49.    In addition to Defendants' failing to disclose the Impersonation Incident, they also failed to disclose that a prominent institutional investor, Goldman Sachs, had declined to invest $40 million in Ozy Media specifically because of the Impersonation incident.  While Goldman Sachs' failure to invest, in and itself, would not normally be something the Company was required to disclose, the fact that the refusal to invest was based on misconduct out of the ordinary of the Company's business, is information that renders the Representations false or, at a minimum, misleading.

163056.00601/129061142V.1

50.     The fact that Ozy Media solicited investments from LifeLine contemporaneous with the Impersonation Incident (and secured LifeLine's investment within days of the Impersonation Incident) and Goldman Sachs' resulting refusal to invest reflects Defendants' scienter.  It is no coincidence that the Company went out of its way to "reopen" the Series C round of funding to accommodate an immediate and "important" investment from LifeLine just days after the Impersonation Incident.  As a purely factual matter, it is reasonable to conclude that the Company did so *because* it had lost a substantial investment and needed new, additional investors to help replace the lost Goldman Sachs investment.  This was particularly important since, when soliciting investments from LifeLine, Defendants repeatedly touted the interest of other well-known investors in the Company.  Thus, Defendants and each of them hid the Impersonation Incident and resulting consequences from LifeLine so as not to interfere with this goal.

### *Defendant Watson's Post-Impersonation Incident Statements and Admissions*

51.     On October 5, 2021, Watson admitted during an interview on "The Breakfast Club" (a national radio broadcast program) that he was aware of Rao's fraudulent and illegal conduct "the same day" it occurred (i.e., February 2, 2021) and, specifically, that he received a call from the potential investor a "couple of hours" after Rao's fraudulent conduct during the telephone call on February 2, 2021. (*See* https://www.youtube.com/watch?v=A0K4DRLlTK8 at 4:50-5:35.)  Watson described Rao's conduct as "horrific", acknowledged that it "wasn't good and it wasn't okay", and confirmed that it caused the Ozy Media to lose a substantial $40 million investment from "what could have been a really terrific investor".  (*Id*. at 16:49-16:59.)

52.     Obviously, at the time LifeLine's investment was solicited and the Series C SPA was executed Watson was well aware of the "horrific" conduct of Rao and that the consequences were anything but business as usual and that something out of the ordinary directly affecting the Company's ability to remain operational in any jurisdiction and, therefore the health of its financial condition, had just occurred.  When asked whether Rao's misconduct was the reason for Goldman Sachs' refusal to make a substantial ($40 million) investment in the Company, Watson confirmed that was "a hundred percent" the reason.  (*See* https://www.youtube.com/watch?v=A0K4DRLlTK8

13

at 6:04-6:54 and 17:00-17:20.)  There is only one plausible reason for Watson and Rao not to have disclosed the Impersonation Incident and resulting consequences to LifeLine when it solicited investments from LifeLine starting just days after the incident – because both knew that making such a disclosure would have also led LifeLine, as another potential investor, to decline to invest.  At a minimum, the failure to disclose the Impersonation Incident while seeking millions of dollars from an investor for the benefit of whom the Representations were being made was extraordinarily reckless and much more likely purely intentional.  Defendants' failures to disclose, in an effort to protect Ozy Media, extended beyond LifeLine.  LifeLine is informed and believes and, based thereon, alleges that Defendants were concerned that disclosure of Rao's misconduct would result in substantial negative publicity and potentially fatal reputational damage to the Company and have an undesired chilling effect on potential investors, beyond just LifeLine, at a time when it was seeking substantial investments from institutional investors, LifeLine, and others.

53.     Watson further disclosed during that radio interview on October 5, 2021, that the day of the Impersonation Incident or the next day he was on the "phone, obviously, with investors, and others,       our       board       members"       to       disclose       Rao's       fraudulent       conduct. (https://www.youtube.com/watch?v=A0K4DRLlTK8 at 4:50-5:35.)  The "investors" and "others" to whom Watson apparently disclosed Rao's fraudulent conduct _did not include_ LifeLine despite Watson and Rao actively soliciting LifeLine's investment in the Company _at essentially the very same time that the fraudulent conduct occurred and despite LifeLine signing the Series C SPA just three weeks after Rao's fraudulent conduct and Watson's knowledge of that misconduct_.  Watson disclosed the incident to investors whose money Ozy Media already had; but, not coincidentally he failed to disclose it to LifeLine which was actively evaluating at the time whether to invest millions of dollars in the Company.   Again, the reason is obvious.  Doing so would have led LifeLine to decline to invest in the Company just like Goldman Sachs.

54.     During the same interview, Watson disclosed that Ozy Media had asked Rao, its Co-Founder, Chief Operating Officer and a member of its Board of Directors, to "step down" as a result of the incident.  (_See_ https://www.youtube.com/watch?v=A0K4DRLlTK8 at 6:54-7:00.)

14

163056.00601/129061142V.1

55.     The information disclosed by Watson during his public interview on October 5, 2021, as set forth herein, was not disclosed to LifeLine by any of the Defendants prior to either of Lifeline's investments in Ozy Media.  Ironically, when Watson was asked during the interview what he would "tell investors" in order to earn back their trust, he responded with, "just the truth". (*See* https://www.youtube.com/watch?v=A0K4DRLlTK8 at 43:21-28.)  Unfortunately, the truth did not extend to those who were, only days after the Impersonation Incident, considering whether to invest in the Company.

56.     At no time prior to LifeLine's execution of the Series C SPA and Series D SPA did Defendants, or any of them, disclose to LifeLine the fact of Rao's fraudulent conduct or any of the resulting consequences to Ozy Media. The failure by Ozy Media, Watson and Rao to disclose this information to LifeLine rendered the Company's Representations, as alleged herein, false or misleading.  The above-described temporal factors combined with Watson's post-Impersonation Incident statements and admissions confirm that at the time the SPAs were executed, Defendants, and each of them, knew the Representations were false and yet said nothing.  The Company entered into the SPAs with actual knowledge of facts and circumstances that rendered the Representations false.  Given the Defendants' *admitted* actual knowledge, there is no other reasonable conclusion than that Defendants intentionally failed to disclose the relevant, material and highly damning information to LifeLine.

57.     Finally, in early October 2021, Ozy Media announced that due to the Impersonation Incident and the resulting circumstances, the Company was ceasing operations.  Thus, any doubt as to whether the undisclosed events "might" have a "Material Adverse Effect" on the Company by interfering with its ability to conduct business is disposed of by the Company announcing this action.  The concerns that drove Ozy Media, Watson and Rao to conceal Rao's fraudulent conduct from LifeLine materialized when Rao's actions became publicly known in September 2021.

58.     The public disclosure of Rao's misconduct led to a media firestorm of negative publicity and reputational harm to Ozy Media, Watson and Rao; the resignation of the chairman of Ozy Media's Board of Directors (Marc Lasry) who stated he lacked the experience in "crisis

**SECOND AMENDED COMPLAINT**
**CASE NO. 21-CV-07751-BLF**

163056.00601/129061142V.1

management and investigations" to continue leading the embattled company; a well-known investor (SV Angel) surrendering its shares in the Company; and, an initial decision by the Company's board of directors to cease the Company's operations and wind down its affairs.  All of these are consequences from circumstances that the Representations assured Lifeline did not exist.  The Defendants, and each of them, were correct in their assessment that disclosing the Impersonation Incident and the resulting circumstances to LifeLine would have resulted in LifeLine refusing to invest which is the very reason they knowingly failed to disclose.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against Defendant Ozy Media)

59.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 58 above as though set forth here in full.

60.     Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) empowered the SEC to enact rules against "manipulative and deceptive practices" in connection with the sale of securities.

61.     Pursuant to Section 10(b), the SEC adopted Rule 10b-5 (17 C.F.R. § 240.10b-5) which provides, in part, that it is unlawful to omit to state a material fact in connection with the sale of securities or to engage in any fraud upon any person in connection with the sale of securities.

62.     By knowingly failing to disclose the Impersonation Incident and resulting consequences, including Rao's requested resignation, investigations into Ozy Media by the SEC and DOJ, and Goldman Sachs' refusal to invest as a direct result of the Company's fraudulent conduct, Ozy Media, through Watson and Rao as officers of the Company, violated Rule 10b-5.  Ozy Media's omission of these facts made the Representations set forth in Sections 3.6(h), 3.6(m), 3.6(n), and 3.12 of the SPAs false or, at minimum, misleading.

63.     Pursuant to Section 3.6(h) of the SPAs, Ozy Media represented to Plaintiff that "the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such [key] officer or key employee".  As publicly confirmed by Watson on

October 5, 2021, this representation was unquestionably false.  In fact, following Rao's misconduct, Ozy Media *asked* Rao (its Co-Founder, Chief Operating Officer and Director) to "step down" (i.e., resign).  That fact was not disclosed by Ozy Media to Plaintiff before it made either of its investments in the Company.

64.    Pursuant to Section 3.6(m) of the SPAs, Ozy Media represented to Plaintiff that there had not been "any failure to conduct business in the ordinary course, consistent with the Company's past practices;".  On October 5, 2021, Watson confirmed that this representation was false or, at minimum, misleading when he described Rao's fraudulent conduct preceding LifeLine's execution of the SPAs as "horrific" and stated that Rao's misconduct "wasn't good and it wasn't okay".  Making matters worse, Watson confirmed he knew of the circumstances he described as "horrific" immediately after they occurred and therefore before the SPAs were executed.  Watson, the Co-Founder, Chief Executive Officer, and a Director of the Company, knew and, on October 5, 2021, Watson confirmed that Rao's misconduct was not how Ozy Media ordinarily conducted its business and that, according to him, it was in no way consistent with the Company's past practices.  Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Ozy Media to Plaintiff before it invested in the Company.

65.    Pursuant to Section 3.6(n) of the SPAs, Ozy Media represented to Plaintiff that there had not been "to the Company's knowledge, any other event or condition of any character that might result in a Material Adverse Effect" to the company.  Because the Impersonation Incident led to investigations by the SEC and DOJ, it clearly threatened and continues to threaten the Company's ability to be qualified to conduct business, the loss of such qualification having an unquestionably adverse effect on the Company.  Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Ozy Media to Plaintiff before it invested in the Company.

66.    Section 3.12 of the SPAs is a representation to Plaintiff that "[t]here are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."  This representation was false or, at minimum, misleading

17

because, in fact, the SEC and DOJ had opened investigations into Ozy Media and its operations as a result of the Impersonation Incident.  Plaintiff is informed and believes and, based thereon, alleges that the government investigations into the Company were opened prior to Plaintiff's execution of the SPAs and its investments in the Company.  The fact that the SEC and DOJ had opened investigations into Ozy Media as a result of Rao's fraudulent conduct was not disclosed by the Company to Plaintiff before it invested in the Company despite the fact that Ozy Media represented to Plaintiff that there were no such investigations.

67.    Because of Watson's admissions following the Impersonation Incident that he, as Co-Founder, Chief Executive Officer, and Director of Ozy Media, was aware of the Impersonation Incident immediately after it occurred and since Rao was obviously aware of his own actions, it is clear that the Company knew or should have known that the failure to disclose the Impersonation Incident and resulting consequences would render the Representations false or, at a minimum, misleading.

68.    In light of the prior professional relationship between Plaintiff and Watson, and based on Watson and Rao touting continued institutional investor interest in Ozy Media despite Goldman Sachs' refusing to invest, Plaintiff had no reason to suspect that any of the Representations by the Company in the SPAs were false or misleading.   As specifically alleged in Paragraphs 26 and 33 herein, Plaintiff relied on the Representations in the SPAs, including the representations at Sections 3.6(h), 3.6(m), 3.6(n) and 3.12 as being truthful.

69.    Had Plaintiff been aware of the Impersonation Incident and resulting consequences, it would never have executed the SPAs and would never have invested in Ozy Media.

70.    15 U.S.C. § 78cc(b) of the Exchange Act provides that all contracts entered into in violation of the Exchange Act are voidable.  Based upon the actions of Ozy Media in connection with the Series C SPA and Series D SPA, Plaintiff is entitled to rescission of the SPAs, the return of all sums paid by Plaintiff pursuant thereto ($2,250,000), interest on said amounts and attorneys' fees and costs.

163056.00601/129061142V.1

### SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against Defendant Samir Rao)**

71.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 58 above as set forth here in full.

72.   Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) empowered the SEC to enact rules against "manipulative and deceptive practices" in connection with the sale of securities.

73.   Pursuant to Section 10(b), the SEC adopted Rule 10b-5 (17 C.F.R. § 240.10b-5) which provides, in part, that that it is unlawful to: "employ any device, scheme, or artifice to defraud"; or any material omission; or "engage in any act, practice, or course of business which operates or would operate as fraud or deceit" in connection with the sale of securities or to engage in any fraud upon any person in connection with the sale of securities.

74.   Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) empowered the SEC to enact rules against "manipulative and deceptive practices" in connection with the sale of securities.

75.   By knowingly failing to disclose the Impersonation Incident and resulting consequences, including Rao's forced resignation, investigations by the SEC and DOJ, and Goldman Sachs' refusal to invest as direct result of the Company's fraudulent conduct, Rao, as an officer and director of the Company, violated Rule 10b-5.   Rao's omission of these facts, after soliciting Plaintiff's investment in the Company and sending the Series C SPA and Series D SPA to Plaintiff via email, made the Representations set forth in Sections 3.6(h), 3.6(m), 3.6(n), and 3.12 of the SPAs false or, at minimum, misleading.

76.   Pursuant to Section 3.6(h) of the SPAs, Ozy Media represented to Plaintiff that "the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such [key] officer or key employee".   As publicly confirmed by Watson on October 5, 2021, this representation was unquestionably false.   In fact, following Rao's misconduct, Ozy Media *asked* Rao (its Co-Founder, Chief Operating Officer and Director) to "step down" (i.e.,

19

resign).  That fact was not disclosed by Rao to Plaintiff before it made either of its investments in the Company.

77.     Pursuant to Section 3.6(m) of the SPAs, Ozy Media represented to Plaintiff that there had not been "any failure to conduct business in the ordinary course, consistent with the Company's past practices;".  Rao knew that this representation was false or, at minimum, misleading because he had engaged in the Impersonation Incident.  Rao knew that the Impersonation Incident was not how Ozy Media ordinarily conducted its business and that it was in no way consistent with the Company's past practices.  Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Rao to Plaintiff before it invested in the Company.

78.     Pursuant to Section 3.6(n) of the SPAs, Ozy Media represented to Plaintiff that there had not been "to the Company's knowledge, any other event or condition of any character that might result in a Material Adverse Effect" to the company.  Because the Impersonation Incident led to investigations by the SEC and DOJ, Rao knew that the Impersonation Incident clearly threatened and continues to threaten the Company's ability to be qualified to conduct business, the loss of such qualification having an unquestionably adverse effect on the Company. Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Rao to Plaintiff before it invested in the Company.

79.     Section 3.12 of the SPAs is a representation to Plaintiff that "[t]here are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."  Rao knew that this representation was false or, at minimum, misleading because, in fact, the SEC and DOJ had opened investigations into Ozy Media and its operations as a result of the Impersonation Incident.  Plaintiff is informed and believes and, based thereon, alleges that the government investigations into the Company were opened prior to Plaintiff's execution of the SPAs and its investments in the Company.  The fact that the SEC and DOJ had opened investigations into Ozy Media as a result of the Impersonation Incident was not

disclosed by Rao to Plaintiff before it invested in the Company despite the fact that Ozy Media represented to Plaintiff that there were no such investigations.

80.     Despite numerous discussions, written and oral, with Plaintiff regarding its potential investments in Ozy Media, including correspondence between Rao and Plaintiff's principals from February 10 through May 9, 2021, Rao failed to disclose to Plaintiff that the Company and specifically that he, personally, had engaged in misconduct in connection with the solicitation of investments from other investors; or that his misconduct might have a material adverse effect on the Company (i.e., government investigations and the loss of a $40 million investment); or that he was asked by the Company to resign from his position as an officer and direct; or that the SEC and DOJ had opened investigations into Ozy Media as a result of his misconduct.  The reason for the non-disclosure was that Rao's conduct was not within the ordinary course of the Company's business and that disclosure of that the Company was concerned that disclosure of that conduct would cause Plaintiff – like Goldman Sachs only weeks earlier – to refuse to invest in the Company.

81.     Rao had actual knowledge of the Impersonation Incident since he, personally, engaged in the misconduct in his capacity as a Co-Founder, Chief Operating Officer and Director of Ozy Media.

82.     In light of the prior professional relationship between Plaintiff and Watson, and based on Watson and Rao touting continued institutional investor interest in Ozy Media despite Goldman Sachs' refusing to invest, Plaintiff had no reason to suspect that any of the Representations by the Company in the SPAs were false or misleading.   As specifically alleged in Paragraphs 26 and 33 herein, Plaintiff relied on the Representations in the SPAs, including the representations at Sections 3.6(h), 3.6(m), 3.6(n) and 3.12 as being truthful.

83.     Had Plaintiff been aware of such fraudulent conduct it would never have executed the Series C SPA or the Series D SPA and would never have invested in Ozy Media.

84.     Rao's fraudulent conduct was (obviously) known to Rao, but Rao did not disclose his misconduct, and the resulting material adverse effects it had on Ozy Media at any time after he sent the Series C SPA and Series D SPA to Plaintiff, or at any time prior to Plaintiff's investments in Ozy

Media pursuant to those agreements.  As a result, Plaintiff has incurred damage in the amount of its investments in Ozy Media ($2,250,000), plus interest thereon.

<u>**THIRD CLAIM FOR RELIEF**</u>

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against Defendant Carlos Watson)**

85.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 58 above as set forth here in full.

86.     Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) empowered the SEC to enact rules against "manipulative and deceptive practices" in connection with the sale of securities.

87.     Pursuant to Section 10(b), the SEC adopted Rule 10b-5 (17 C.F.R. § 240.10b-5) which provides, in part,

88.     Pursuant to Section 10(b), the SEC adopted Rule 10b-5 (17 C.F.R. § 240.10b-5) which provides, in part, that that it is unlawful to: "employ any device, scheme, or artifice to defraud"; "make any untrue statement of a material fact", or any material omission; or "engage in any act, practice, or course of business which operates or would operate as fraud or deceit"  in connection with the sale of securities or to engage in any fraud upon any person in connection with the sale of securities.

89.     In taking the actions alleged herein, Watson, as a Co-Founder, Chief Executive Officer and Director of Ozy Media, and the executive at the Company who directly solicited Plaintiff's investments in the Company and signed the Series C SPA and the Series D SPA on behalf of the Company, violated Rule 10b-5 by failing to disclose Rao's fraudulent conduct to Plaintiff and by failing to disclose any of the consequences from Rao's misconduct, including the loss of a substantial $40 million investment in the Company, the request that Rao resign as an officer and director of the Company, and the opening of investigations by the SEC and DOJ into the Company and its operations.  Watson's omission of these facts made the Representations set forth in Sections

3.6(h), (m) and (n), and 3.12 of the Series C SPA and Series D SPA false or, at minimum, misleading.

90.     Pursuant to Section 3.6(h) of the SPAs, Ozy Media represented to Plaintiff that "the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such [key] officer or key employee".  As publicly confirmed by Watson on October 5, 2021, this representation was unquestionably false.  In fact, following Rao's misconduct, Ozy Media *asked* Rao (its Co-Founder, Chief Operating Officer and Director) to "step down" (i.e., resign).  That fact was not disclosed by Watson to Plaintiff before it made either of its investments in the Company.

91.     Pursuant to Section 3.6(m) of the SPAs, Ozy Media represented to Plaintiff that there had not been "any failure to conduct business in the ordinary course, consistent with the Company's past practices;".  On October 5, 2021, Watson confirmed that this representation was false or, at minimum, misleading when he described Rao's fraudulent conduct preceding LifeLine's execution of the SPAs as "horrific" and stated that Rao's misconduct "wasn't good and it wasn't okay".  Making matters worse, Watson confirmed he knew of the circumstances he described as horrific immediately after they occurred and therefore before the SPAs were executed.  Watson, the Co-Founder, Chief Executive Officer, and a Director of the Company, knew and, on October 5, 2021, Watson confirmed that Rao's misconduct was not how Ozy Media ordinarily conducted its business and that, according to him, it was in no way consistent with the Company's past practices.  Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Watson to Plaintiff before it invested in the Company.

92.     Pursuant to Section 3.6(n) of the SPAs, Ozy Media represented to Plaintiff that there had not been "to the Company's knowledge, any other event or condition of any character that might result in a Material Adverse Effect" to the company.  Because the Impersonation Incident led to investigations by the SEC and DOJ, it clearly threatened and continues to threaten the Company's ability to be qualified to conduct business, the loss of such qualification having an unquestionably

23

adverse effect on the Company. Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Watson to Plaintiff before it invested in the Company.

93.     Section 3.12 of the SPAs is a representation to Plaintiff that "[t]here are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."  This representation was false or, at minimum, misleading because, in fact, the SEC and DOJ had opened investigations into Ozy Media and its operations as a result of the Impersonation Incident.  Plaintiff is informed and believes and, based thereon, alleges that the government investigations into the Company were opened prior to Plaintiff's execution of the SPAs and its investments in the Company.  The fact that the SEC and DOJ had opened investigations into Ozy Media as a result of Rao's fraudulent conduct was not disclosed by Watson to Plaintiff before it invested in the Company despite the fact that Ozy Media represented to Plaintiff that there were no such investigations.

94.     Despite numerous discussions, written and oral, with Plaintiff regarding its potential investments in Ozy Media, including numerous correspondence between Watson and Plaintiff's principals from February 10 through May 9, 2021, Watson failed to disclose to Plaintiff that the Company and specifically Rao had engaged in fraudulent conduct in connection with its solicitation of investments from other investors; or that Rao's misconduct might have a material adverse effect on the company's financials (i.e., government investigations and the loss of a $40 million investment); or that Rao, the Co-Founder, Chief Operating Officer and Director of Ozy Media was asked by the Company to resign from his positions; or that the SEC and DOJ had opened investigations into the Company as a result of Rao's misconduct.  The reason for the non-disclosure was that Rao's misconduct was not within the ordinary course of the Company's business and that disclosure of that the Company was concerned that disclosure of that conduct would cause Plaintiff – like Goldman Sachs only weeks earlier – to refuse to invest in the Company.

95.     On October 5, 2021, Watson admitted that he had actual knowledge of Rao's fraudulent conduct on the day it occurred; that Rao's misconduct might have a material adverse effect on the Company; and that Rao was asked to resign as an officer and director of the Company.

96.     In light of the prior professional relationship between Plaintiff and Watson, and based on Watson and Rao touting continued institutional investor interest in Ozy Media despite Goldman Sachs' refusing to invest, Plaintiff had no reason to suspect that any of the Representations by the Company in the SPAs were false or misleading.   As specifically alleged in Paragraphs 26 and 33 herein, Plaintiff relied on the Representations in the SPAs, including the representations at Sections 3.6(h), 3.6(m), 3.6(n) and 3.12 as being truthful.

97.     Had Plaintiff been aware of such fraudulent conduct it would never have executed the Series C SPA or the Series D SPA and would never have invested in Ozy Media.

98.     Rao's fraudulent conduct was known to Watson on the day it occurred, but Watson did not disclose that conduct, and the resulting effects on Ozy Media to Plaintiff prior to its investments in Ozy Media.   As a result, Plaintiff has incurred damage in the amount of its investments in Ozy Media ($2,250,000), plus interest thereon.

## FOURTH CLAIM FOR RELIEF

### Fraud in the Sale of Securities

### Violation of California Corporations Code § 25401 *et seq*.

### (Against Defendant Ozy Media)

99.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 58 above as set forth here in full.

100.    California Corporations Code § 25401 provides, in pertinent part, as follows: "It is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."

SECOND AMENDED COMPLAINT
CASE NO. 21-CV-07751-BLF

163056.00601/129061142V.1

101.    In taking the actions alleged herein, all directed by Watson and Rao as officers and directors of the Ozy Media, Ozy Media violated California Corporations Code § 25401 *et seq*., by failing to disclose Rao's fraudulent conduct to Plaintiff and by failing to disclose any of the consequences from Rao's misconduct, including the loss of a $40 million investment in the Company, the request by the Company that Rao resign from his positions as executive and director, and the resulting government investigations into the Company and its operations. Ozy Media's omission of these facts made the Representations set forth in Sections 3.6(h), (m) and (n), and 3.12 of the Series C SPA and Series D SPA false or, at minimum, misleading.

102.    Pursuant to Section 3.6(h) of the SPAs, Ozy Media represented to Plaintiff that "the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such [key] officer or key employee".  As publicly confirmed by Watson on October 5, 2021, this representation was unquestionably false.  In fact, following Rao's misconduct, Ozy Media *asked* Rao (its Co-Founder, Chief Operating Officer and Director) to "step down" (i.e., resign).  That fact was not disclosed by Ozy Media to Plaintiff before it made either of its investments in the Company.

103.    Pursuant to Section 3.6(m) of the SPAs, Ozy Media represented to Plaintiff that there had not been "any failure to conduct business in the ordinary course, consistent with the Company's past practices;".  On October 5, 2021, Watson confirmed that this representation was false or, at minimum, misleading when he described Rao's fraudulent conduct preceding LifeLine's execution of the SPAs as "horrific" and stated that Rao's misconduct "wasn't good and it wasn't okay".  Making matters worse, Watson confirmed he knew of the circumstances he described as "horrific" immediately after they occurred and therefore before the SPAs were executed.  Watson, the Co-Founder, Chief Executive Officer, and a Director of the Company, knew and, on October 5, 2021, Watson confirmed that Rao's misconduct was not how Ozy Media ordinarily conducted its business and that, according to him, it was in no way consistent with the Company's past practices.  Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Ozy Media to Plaintiff before it invested in the Company.

26

104.     Pursuant to Section 3.6(n) of the SPAs, Ozy Media represented to Plaintiff that there had not been "to the Company's knowledge, any other event or condition of any character that might result in a Material Adverse Effect" to the company.  Because the Impersonation Incident led to investigations by the SEC and DOJ, it clearly threatened and continues to threaten the Company's ability to be qualified to conduct business, the loss of such qualification having an unquestionably adverse effect on the Company.  Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Ozy Media to Plaintiff before it invested in the Company.

105.     Section 3.12 of the SPAs is a representation to Plaintiff that "[t]here are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."  This representation was false or, at minimum, misleading because, in fact, the SEC and DOJ had opened investigations into Ozy Media and its operations as a result of the Impersonation Incident.  Plaintiff is informed and believes and, based thereon, alleges that the government investigations into the Company were opened prior to Plaintiff's execution of the SPAs and its investments in the Company.  The fact that the SEC and DOJ had opened investigations into Ozy Media as a result of Rao's fraudulent conduct was not disclosed by the Company to Plaintiff before it invested in the Company despite the fact that Ozy Media represented to Plaintiff that there were no such investigations.

106.     Because of Watson's admissions following the Impersonation Incident that he, as Co-Founder, Chief Executive Officer, and Director of Ozy Media, was aware of the Impersonation Incident immediately after it occurred and since Rao was obviously aware of his own actions, it is clear that the Company knew or should have known that the failure to disclose the Impersonation Incident and resulting consequences would render the Representations false or, at a minimum, misleading.

107.     In light of the prior professional relationship between Plaintiff and Watson, and based on Watson and Rao touting continued institutional investor interest in Ozy Media despite Goldman Sachs' refusing to invest, Plaintiff had no reason to suspect that any of the Representations by the

163056.00601/129061142V.1

Company in the SPAs were false or misleading.   As specifically alleged in Paragraphs 26 and 33 herein, Plaintiff relied on the Representations in the SPAs, including the representations at Sections 3.6(h), 3.6(m), 3.6(n) and 3.12 as being truthful.

108.   Had Plaintiff been aware of the Impersonation Incident and resulting consequences, it would never have executed the SPAs and would never have invested in Ozy Media.

109.   Section 25501 of the California Corporations Code provides that all contracts entered into in violation of Section 25401 are voidable.  Based upon the actions of Ozy Media in connection with the Series C SPA and the Series D SPA, Plaintiff is entitled to rescission of the SPAs, the return of all sums paid by Plaintiff pursuant thereto ($2,250,000), plus interest on said amounts and attorneys' fees and costs.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**Fraud in the Sale of Securities**

**Violation of California Corporations Code § 25401 *et seq*.**

**(Against All Defendant Samir Rao)**

110.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 58 above as set forth here in full.

111.   California Corporations Code § 25401 provides, in pertinent part, as follows: "It is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."

112.   In taking the actions alleged herein, Rao, as a Co-Founder, Officer and Director of Ozy Media, and the representative of Ozy Media who provided, via email, the Series C SPA and the Series D SPA to Plaintiff, violated California Corporations Code § 25401 *et seq*., by failing to disclose his fraudulent conduct to Plaintiff and by failing to disclose any of the consequences from his misconduct, including the loss of a $40 million investment in the Company, the request by the Company that he resign from his positions as executive and director, and the resulting government

investigations into the Company and its operations.  Rao's omission of these facts made the representations set forth in Sections 3.6(h), (m) and (n), and 3.12 of the Series C SPA and Series D SPA false or, at minimum, misleading.

113.    Pursuant to Section 3.6(h) of the SPAs, Ozy Media represented to Plaintiff that "the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such [key] officer or key employee".  As publicly confirmed by Watson on October 5, 2021, this representation was unquestionably false.  In fact, following Rao's misconduct, Ozy Media *asked* Rao (its Co-Founder, Chief Operating Officer and Director) to "step down" (i.e., resign).  That fact was not disclosed by Rao to Plaintiff before it made either of its investments in the Company.

114.    Pursuant to Section 3.6(m) of the SPAs, Ozy Media represented to Plaintiff that there had not been "any failure to conduct business in the ordinary course, consistent with the Company's past practices;".  Rao knew that this representation was false or, at minimum, misleading because he had engaged in the Impersonation Incident.  Rao knew that the Impersonation Incident was not how Ozy Media ordinarily conducted its business and that it was in no way consistent with the Company's past practices.  Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Rao to Plaintiff before it invested in the Company.

115.    Pursuant to Section 3.6(n) of the SPAs, Ozy Media represented to Plaintiff that there had not been "to the Company's knowledge, any other event or condition of any character that might result in a Material Adverse Effect" to the company.  Because the Impersonation Incident led to investigations by the SEC and DOJ, Rao knew that the Impersonation Incident clearly threatened and continues to threaten the Company's ability to be qualified to conduct business, the loss of such qualification having an unquestionably adverse effect on the Company. Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Rao to Plaintiff before it invested in the Company.

116.    Section 3.12 of the SPAs is a representation to Plaintiff that "[t]here are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in

the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."  Rao knew that this representation was false or, at minimum, misleading because, in fact, the SEC and DOJ had opened investigations into Ozy Media and its operations as a result of the Impersonation Incident.  Plaintiff is informed and believes and, based thereon, alleges that the government investigations into the Company were opened prior to Plaintiff's execution of the SPAs and its investments in the Company.  The fact that the SEC and DOJ had opened investigations into Ozy Media as a result of the Impersonation Incident was not disclosed by Rao to Plaintiff before it invested in the Company despite the fact that Ozy Media represented to Plaintiff that there were no such investigations.

117.    Despite numerous discussions, written and oral, with Plaintiff regarding its potential investments in Ozy Media, including correspondence between Rao and Plaintiff's principals from February 10 through May 9, 2021, Rao failed to disclose to Plaintiff that the Company and specifically that he, personally, had engaged in fraudulent conduct in connection with the solicitation of investments from other investors; or that his misconduct might have a material adverse effect on the Company (i.e., government investigations and the loss of a $40 million investment); or that he was asked by the Company to resign from his position as an officer and direct; or that the SEC and DOJ had opened investigations into Ozy Media as a result of his misconduct.  The reason for the non-disclosure was that Rao's conduct was not within the ordinary course of the Company's business and that disclosure of that the Company was concerned that disclosure of that conduct would cause Plaintiff – like Goldman Sachs only weeks earlier – to refuse to invest in the Company.

118.    Rao, as Chief Operating Officer and a Director of the company, engaged in the fraudulent conduct at issue and was aware it had occurred and that the consequences alleged herein followed.

119.    In light of the prior professional relationship between Plaintiff and Watson, and based on Watson and Rao touting continued institutional investor interest in Ozy Media despite Goldman Sachs' refusing to invest, Plaintiff had no reason to suspect that any of the Representations by the Company in the SPAs were false or misleading.   As specifically alleged in Paragraphs 26 and 33

30

herein, Plaintiff relied on the Representations in the SPAs, including the representations at Sections 3.6(h), 3.6(m), 3.6(n) and 3.12 as being truthful.

120.    Had Plaintiff been aware of such fraudulent conduct, Plaintiff would never have executed the Series C SPA or the Series D SPA and would never have invested in Ozy Media.

121.    Rao, personally, engaged in the fraudulent conduct, but did not disclose that misconduct, and the resulting material adverse effects on Ozy Media to Plaintiff prior to its investments in Ozy Media.   As a result, Plaintiff has incurred damage in the amount of its investments in Ozy Media ($2,250,000), plus interest thereon.

## SIXTH CLAIM FOR RELIEF

### Fraud in the Sale of Securities

### Violation of California Corporations Code § 25401 *et seq*.

### (Against All Defendant Carlos Watson)

122.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 58 above as set forth here in full.

123.    California Corporations Code § 25401 provides, in pertinent part, as follows: "It is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading."

124.    In taking the actions alleged herein, Watson, as a Co-Founder, Officer and Director of Ozy Media, and the executive that signed on behalf of Ozy Media on the Series C SPA and the Series D SPA, violated California Corporations Code § 25401 *et seq*., by failing to disclose Rao's fraudulent conduct to Plaintiff and by failing to disclose any of the consequences from Rao's misconduct, including the loss of a $40 million investment in the Company, the request by the Company that Rao resign from his positions as executive and director, and the resulting government investigations into the Company and its operations.   Rao's omission of these facts made the

163056.00601/129061142V.1

representations set forth in Sections 3.6(h), (m) and (n), and 3.12 of the Series C SPA and Series D

SPA false or, at minimum, misleading.

125.     Pursuant to Section 3.6(h) of the SPAs, Ozy Media represented to Plaintiff that "the

Company, to its knowledge, does not know of the impending resignation or termination of

employment of any such [key] officer or key employee".  As publicly confirmed by Watson on

October 5, 2021, this representation was unquestionably false.  In fact, following Rao's misconduct,

Ozy Media *asked* Rao (its Co-Founder, Chief Operating Officer and Director) to "step down" (i.e.,

resign).  That fact was not disclosed by Watson to Plaintiff before it made either of its investments in

the Company.

126.     Pursuant to Section 3.6(m) of the SPAs, Ozy Media represented to Plaintiff that there

had not been "any failure to conduct business in the ordinary course, consistent with the Company's

past practices;".  On October 5, 2021, Watson confirmed that this representation was false or, at

minimum, misleading when he described Rao's fraudulent conduct preceding LifeLine's execution

of the SPAs as "horrific" and stated that Rao's misconduct "wasn't good and it wasn't okay".

Making matters worse, Watson confirmed he knew of the circumstances he described as horrific

immediately after they occurred and therefore before the SPAs were executed.  Watson, the Co-

Founder, Chief Executive Officer, and a Director of the Company, knew and, on October 5, 2021,

Watson confirmed that Rao's misconduct was not how Ozy Media ordinarily conducted its business

and that, according to him, it was in no way consistent with the Company's past practices.  Despite

this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Watson to

Plaintiff before it invested in the Company.

127.     Pursuant to Section 3.6(n) of the SPAs, Ozy Media represented to Plaintiff that there

had not been "to the Company's knowledge, any other event or condition of any character that might

result in a Material Adverse Effect" to the company.  Because the Impersonation Incident led to

investigations by the SEC and DOJ, it clearly threatened and continues to threaten the Company's

ability to be qualified to conduct business, the loss of such qualification having an unquestionably

32

adverse effect on the Company. Despite this, the fact of Rao's misconduct and the consequences thereof were not disclosed by Watson to Plaintiff before it invested in the Company.

128.    Section 3.12 of the SPAs is a representation to Plaintiff that "[t]here are no actions, suits, proceedings or investigations pending against the Company … that, either individually or in the aggregate, if determined adversely to the Company, would or could reasonably be expected to have a Material Adverse Effect … ."  This representation was false or, at minimum, misleading because, in fact, the SEC and DOJ had opened investigations into Ozy Media and its operations as a result of the Impersonation Incident.  Plaintiff is informed and believes and, based thereon, alleges that the government investigations into the Company were opened prior to Plaintiff's execution of the SPAs and its investments in the Company.   The fact that the SEC and DOJ had opened investigations into Ozy Media as a result of Rao's fraudulent conduct was not disclosed by Watson to Plaintiff before it invested in the Company despite the fact that Ozy Media represented to Plaintiff that there were no such investigations.

129.    Despite numerous discussions, written and oral, with Plaintiff regarding its potential investments in Ozy Media, including correspondence between Watson and Plaintiff's principals from February 10 through May 9, 2021, Watson failed to disclose to Plaintiff that the Company and specifically Rao had engaged in fraudulent conduct in connection with its solicitation of investments from other investors; or that Rao's misconduct might have a material adverse effect on the Company (i.e., government investigations and the loss of a $40 million investment); or that Rao, the Chief Operating Officer of Ozy Media was asked by the company to resign from his position; or that the SEC and DOJ had opened investigations into Ozy Media as a result of Rao's misconduct.  The reason for the non-disclosure was that Rao's conduct was not within the ordinary course of the Company's business and that disclosure of that the Company was concerned that disclosure of that conduct would cause Plaintiff – like Goldman Sachs only weeks earlier – to refuse to invest in the Company. .

SECOND AMENDED COMPLAINT
CASE NO. 21-CV-07751-BLF

163056.00601/129061142V.1

130.     On October 5, 2021, Watson admitted that he had actual knowledge of Rao's fraudulent conduct on the day it occurred; that Rao's conduct caused the company to lose a $40 million investment; and that Rao was asked to resign as an executive and director of the Company.

131.     In light of the prior professional relationship between Plaintiff and Watson, and based on Watson and Rao touting continued institutional investor interest in Ozy Media despite Goldman Sachs' refusing to invest, Plaintiff had no reason to suspect that any of the Representations by the Company in the SPAs were false or misleading.    As specifically alleged in Paragraphs 26 and 33 herein, Plaintiff relied on the Representations in the SPAs, including the representations at Sections 3.6(h), 3.6(m), 3.6(n) and 3.12 as being truthful.

132.     Had Plaintiff been aware of such fraudulent conduct, Plaintiff would never have executed the Series C SPA or the Series D SPA and would never have invested in Ozy Media.

133.     Rao's fraudulent conduct was known to Watson on the day it occurred, but Watson did not disclose that conduct, and the resulting material adverse effects on Ozy Media to Plaintiff prior to its investments in Ozy Media.  As a result, Plaintiff has incurred damage in the amount of its investments in Ozy Media ($2,250,000), plus interest thereon.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A.     Ordering the Series C SPA and the Series D SPA be rescinded and requiring Defendant Ozy Media to repay to Plaintiff all sums paid by it pursuant to said agreements, plus interest as provided by law;

B.     Ordering Defendant Rao to pay to Plaintiff damages in the amount of Plaintiff's investment in Ozy Media, plus interest as provided by law;

C.     Ordering Defendant Watson to pay to Plaintiff damages in the amount of Plaintiff's investment in Ozy Media, plus interest as provided by law;

D.     Awarding Plaintiff pre-judgment interest, reasonable attorneys' fees, expert fees and court costs; and,

163056.00601/129061142V.1

1      E.      Awarding Plaintiff such other and further relief as this Court my deem just and

2   proper.

3   DATED:  June 29, 2022                BLANK ROME LLP

4

5

6                                   By:  /s/ Gregory M. Bordo
                                        Gregory M. Bordo
7                                        Christopher J. Petersen
                                         Craig N. Haring
8                                   Attorneys for Plaintiff
                                    LIFELINE LEGACY HOLDINGS LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED COMPLAINT**
**CASE NO. 21-CV-07751-BLF**

163056.00601/129061142V.1

1

## <u>DEMAND FOR TRIAL BY JURY</u>

2
       Plaintiff hereby demands a trial by jury.

3

4
DATED:  June 29, 2022            BLANK ROME LLP

5

6

7
                    By: */s/ Gregory M. Bordo*
                           Gregory M. Bordo

8
                           Christopher J. Petersen
                           Craig N. Nelson

9

10
                  Attorneys for Plaintiff
                  LIFELINE LEGACY HOLDINGS LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36

163056.00601/129061142V.1