```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                       SAN JOSE DIVISION

 4

 5   LIFELINE LEGACY HOLDINGS, LLC,   )  CV-21-7751-BLF
                                      )
 6                    PLAINTIFF,      )  SAN JOSE, CALIFORNIA
                                      )
 7        VS.                         )  NOVEMBER 3, 2022
                                      )
 8   OZY MEDIA ET AL,                 )  PAGES 1-51
                                      )
 9                    DEFENDANT.      )
                                      )
10   _____ )

11                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE BETH LABSON FREEMAN
12               UNITED STATES DISTRICT JUDGE

13                  A P P E A R A N C E S

14

15      FOR THE PLAINTIFF:      BY:  CHRISTOPHER JENS PETERSEN
                                BLANK ROME LLP
16                              2029 CENTURY PARK EAST, 6TH FLOOR
                                LOS ANGELES, CA 90067
17

18

19      FOR THE DEFENDANT:      BY:  ALEXANDER SHAPIRO
        OZY MEDIA                FORD O'BRIEN LANDY LLP
20                              275 MADISON AVE, FLOOR 24
                                NEW YORK, NY 10016
21

22          APPEARANCES CONTINUED ON THE NEXT PAGE

23   OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                                   CERTIFICATE NUMBER 13185
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1          APPEARANCES CONTINUED:

2          FOR THE DEFENDANT:      BY:  AUGUST P. GUGELMANN
           RAO                     SWANSON & MCNAMARA LLP
3                                  300 MONTGOMERY STREET, SUITE 1100
                                   SAN FRANCISCO, CA 94104
4

5          FOR THE DEFENDANT:      BY:  HARTLEY M.K. WEST
           WATSON                  DECHERT LLP
6                                  ONE BUSH STREET, SUITE 1600
                                   SAN FRANCISCO, CA 94104
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1          SAN JOSE, CALIFORNIA                  NOVEMBER 3, 2022

2                        P R O C E E D I N G S

3          (COURT CONVENED AT 9:45 A.M.)

4              THE CLERK:  CALLING CASE 21-7751.  LIFELINE LEGACY

5      HOLDINGS VERSUS OZY MEDIA, ET AL.

6          COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCES, AND

7      IF WE COULD BEGIN WITH PLAINTIFF AND THEN MOVE TO DEFENDANT.

8              MR. PETERSEN:  GOOD MORNING, YOUR HONOR.

9          CHRISTOPHER PETERSEN OF BLANK ROME, LLP FOR PLAINTIFF

10     LIFELINE LEGACY HOLDINGS, LLC.

11             THE COURT:  GOOD MORNING.

12             MR. PETERSEN:  GOOD MORNING.

13             MR. SHAPIRO:  GOOD MORNING, YOUR HONOR.

14         ALEXANDER SHAPIRO OF THE FIRM FORD O'BRIEN LANDY, FOR

15     DEFENDANT OZY MEDIA.

16             THE COURT:  GOOD MORNING.

17             MR. GUGELMANN:  GOOD MORNING, YOUR HONOR.

18         AUGUST GUGELMANN FOR DEFENDANT SAMIR RAO.

19             THE COURT:  HELLO, MR. GUGELMANN .

20         MS. WEST, YOU ARE ON MUTE.

21             MS. WEST:  MY APOLOGIES, YOUR HONOR.

22         GOOD MORNING.  HARTLEY WEST OF DECHERT LLP,  FOR DEFENDANT

23     CARLOS WATSON.

24             THE COURT:  GOOD MORNING.

25         ALL RIGHT.  I HAVE TWO MOTIONS FROM THE DEFENDANTS, AND I
```

1          GUESS A JOINDER ON BEHALF OF MR. WATSON IN THE OZY MEDIA

2     MOTION.

3          MY FIRST OBSERVATION, I GUESS, IS IT'S NOT MY ORIGINAL

4     OBSERVATION, BUT I CONCUR IN IT, THIS IS A WHOLE NEW LAWSUIT,

5     MR. PETERSEN.  IT'S NOT WHAT I WAS EXPECTING.

6          I'M GOING TO -- AND I DON'T THINK -- IT'S NOT ACTUALLY

7     BEYOND THE SCOPE OF WHAT I ALLOWED YOU TO AMEND, SO I'M NOT

8     GOING THERE, BUT I GUESS A LITTLE BIT OF MY FRUSTRATION IS THAT

9     WHAT WE DID THE FIRST TIME WAS A REAL WASTE OF TIME BECAUSE

10    THOSE THEORIES ARE GONE, AND HELLO, IT'S A NEW DAY, WE HAVE A

11    NEW SUIT, AND I CAN'T JUST LOOK TO SEE WHETHER YOU'VE CURED THE

12    DEFICIENCIES I SAW IN THE LAST GO AROUND, BECAUSE EVERYTHING IS

13    NEW HERE.  THE LAW IS STILL THE SAME.  WE KNOW THAT.

14          SO THAT SAID, BUT IT DOESN'T MEAN THAT YOU CAN'T BRING

15    THIS NEW THEORY OF LIABILITY, I DON'T MEAN TO GO THERE AT ALL.

16    HOWEVER, IT DOES READ A LOT LIKE THE FIRST TIME I GO

17    THROUGH ONE OF THESE COMPLAINTS.

18          AND SO I HAVE SOME REAL CONCERNS.  YOU ARE NOW FOCUSING ON

19    FOUR REPS IN THE STOCK PURCHASE AGREEMENTS, AND SO THOSE

20    MISLEADING STATEMENTS, I GUESS YOU ARE NOT ALLEGING, FALSE OR

21    MISLEADING STATEMENTS ARE CLEAR, AND WE KNOW THE DATES THEY

22    WERE MADE, AND WE KNOW THAT THEY ARE ATTRIBUTABLE DIRECTLY TO

23    MR. WATSON, BECAUSE HE SIGNED THE DOCUMENT, AND THUS TO OZY.

24          MR. RAO DID NOT SIGN IT, YOUR THEORY AGAINST HIM IS A

25    SEPARATE THEORY OF DISSEMINATION THEORY UNDER LOZANO.

1    I AM NOT FINDING THE FACTUAL PLEADING THAT I THINK IS

2    REQUIRED, CERTAINLY FOR TWO OF THE REPS.  THE KNOWLEDGE OF

3    RESIGNATIONS OR TERMINATIONS.  I ACTUALLY -- WITHOUT AN

4    ALLEGATION OF WHEN THE RAO RESIGNATION/TERMINATION WAS KNOWN,

5    OR SOME FACTS THAT FROM WHICH I COULD REASONABLY INFER THAT IT

6    WAS KNOWN BEFORE THE STOCK PURCHASE AGREEMENTS, I CAN'T LET

7    THAT GO FORWARD.

8    AND THAT WOULD -- LET'S SEE, MY NOTES ARE -- SORRY, I

9    THOUGHT MY NOTES WERE CLEAR, AND NOW I'M TRYING TO READ THEM.

10   I HAVE REAL CONCERN THAT THE ORDINARY COURSE ALLEGATION, I

11   THINK UNDER THE LAW, THAT DEFENDANTS ARE CORRECT, THAT IT NEEDS

12   TO BE MORE THAN ONE DISCREET ACT, EVEN IF IT WAS -- THIS ONE

13   WAS SHOCKING, I DON'T KNOW HOW SIGNIFICANT IT ULTIMATELY WAS,

14   BUT IT WAS CERTAINLY OUT OF THE BLUE, IT SEEMS.  BUT YOU DON'T

15   ALLEGE THAT IT HAD A FINANCIAL IMPACT, YOU DON'T ALLEGE.

16   I JUST THINK THAT YOU HAVE TO READ MORE INTO -- YOU HAVE

17   TO ALLEGE MORE FACTS IN SHOWING THAT IT WAS A CHANGE IN THE

18   ORDINARY COURSE OF BUSINESS AND HAD IMPACT ON THE FINANCIAL

19   STATEMENTS, AND YOU MAY BE ABLE TO DO THAT.

20   ON THE MATERIAL ADVERSE EFFECT ON FINANCIAL CONDITION, YOU

21   KNOW, I GUESS WHAT MY PROBLEM HERE -- LET ME JUST CUT TO THE

22   CHASE AND THEN HEAR YOUR ARGUMENT, BECAUSE IT REALLY WRAPS INTO

23   SCIENTER AS WELL.

24   WHAT YOU HAVE -- WHAT I THINK YOU ARE ALLEGING HERE IS

25   THAT ALL THE DEFENDANTS KNEW THAT MR. RAO FALSELY IMPERSONATED

1    A YOUTUBE REPRESENTATIVE.  YES, THEY ALL KNEW THAT, BUT YOU

2    DON'T ACTUALLY ALLEGE AND CONNECT THE DOT ON THE CAUSATION TO

3    THESE REPRESENTATIONS IN THE SPA'S.

4         AND SO MERE KNOWLEDGE OF THE FALSITY OF THE RAO

5    IMPERSONATION DOESN'T REALLY GET YOU VERY FAR BECAUSE OF THE

6    DISCLOSURE THAT TWO LIFELINE THAT GOLDMAN HAD PULLED OUT.  AND

7    THAT'S THE MATERIAL -- TO ME, THAT'S WHAT'S MATERIAL.

8         AND I DON'T THINK YOU'VE ACTUALLY ALLEGED WHY THE

9    ADDITIONAL FACT OF THE REASON IS SEPARATELY MATERIAL TO THE

10   CLEAR DISCLOSURE THAT GOLDMAN HAD CHOSEN NOT TO INVEST.

11        AND YOU KNOW, THERE'S A -- THERE'S NO CASE LIKE THIS, THIS

12   IS REALLY AN UNUSUAL CIRCUMSTANCE.  BUT THERE ARE MANY CASES

13   WHERE A COMPANY DISCLOSES A CHANGE IN ITS COURSE, AND THE

14   REASON COULD BE THAT THERE'S ABSOLUTE CHAOS BREAKING OUT UNDER

15   EVERYTHING, BUT THE LAW DOESN'T REQUIRE THEM TO SAY THE WHY, IT

16   REQUIRES THEM TO SAY THE WHAT, AND THE EFFECT ON THE INVESTMENT

17   AND THE PUBLIC COMPANY ON THE STOCK, AND HERE PRIVATE INVESTOR.

18        SO I JUST DON'T HAVE ANY SET OF FACTS THAT YOU'VE ALLEGED

19   THAT SHOW THE LINE OF CAUSATION, THAT THERE WAS SCIENTER, THAT

20   MR. RAO, UNDER DISSEMINATION, WHICH IS DIFFERENT, OR MR. WATSON

21   IN THE COMPANY, ACTUALLY THAT THEIR WITHHOLDING OF THE FALSITY

22   OF THE RAO IMPERSONATION WAS A MISREPRESENTATION HERE.

23        NOW IF THEY KNEW THAT THEY HAD ALREADY SAT DOWN WITH

24   MR. RAO AND SAID, YOU ARE OUT THE DOOR, THEN YOU WOULD HAVE

25   SOMETHING, BECAUSE HE WAS THE COO AND A COFOUNDER, AND IF HE

1    WAS ABOUT TO LEAVE, AN INVESTOR WOULD HAVE THE RIGHT TO KNOW

2    THAT.  SO THAT'S THE REPRESENTATION THERE, BUT I DON'T HAVE

3    ANYTHING YET.

4        I THINK THE ORDINARY COURSE, YOU MIGHT BE ABLE TO MAKE

5    THAT ONE OUT, I'M NOT CERTAIN.  ON THE MATERIAL ADVERSE EFFECT,

6    I WASN'T SEEING ANYTHING THERE THAT LOOKED LIKE IT WAS WORKING,

7    JUST FACTUALLY, AND I AM ALSO CONCERNED THAT THERE ARE FORWARD

8    LOOKING STATEMENTS HERE, SO THAT'S A CONCERN.

9        NOW MOVING ON TO RAO, THE DISSEMINATION THEORY, I JUST --

10   YOU JUST HAVEN'T ALLEGED THAT MR. RAO EVER READ THE SPA'S.  AND

11   I THINK UNDER 9(B), IT'S JUST NOT ENOUGH TO SAY, WELL, HE WAS

12   THE CEO, SO HE MUST HAVE.  I DON'T KNOW THAT THAT'S ENOUGH.

13       AND THEN TO DRAW THE LINE THAT HIS MERE SENDING AN E-MAIL

14   WITH THEM CONTAINED IN IT, IT JUST -- YOU KNOW, IT JUST DOESN'T

15   COME CLOSE TO THE FACTS THAT THE SUPREME COURT FOUND WERE

16   ENOUGH, BECAUSE IN THE LORENZO CASE, THE DEFENDANT THERE ADMITS

17   HE KNEW THAT THE MATERIAL HE WAS TRANSMITTING WAS FALSE.  AND

18   HERE, YOU DON'T HAVE ANY ALLEGATIONS OF THAT.

19       AND EVEN THE FALSITY ISSUE IS -- IT'S PRETTY ATTENUATED TO

20   ME, BECAUSE THE GOLDMAN WITHDRAWAL OF INVESTMENT WAS DISCLOSED.

21   I'M JUST NOT SURE THAT THE REASON FOR THEIR CHANGE, OF COURSE,

22   IS MATERIAL.

23       SO THAT'S A LITTLE BIT -- SORRY, THAT'S A LITTLE

24   SCATTERED, I APOLOGIZE FOR THAT.  BUT LET ME TURN -- LET'S SEE,

25   MR. SHAPIRO, ARE YOU TAKING THE LEAD ON THE ARGUMENT FOR OZY?

1        MR. SHAPIRO:  I AM, YOUR HONOR.

2        THE COURT:  ALL RIGHT.  LET ME HEAR YOUR ARGUMENT.

3        MR. SHAPIRO:  SURE, YOUR HONOR.

4    LET ME TAKE THE CONSIDERATIONS THAT YOUR HONOR HAS RAISED

5  AND TRY AND ADDRESS THOSE.

6        THE COURT:  AND PLEASE, ANY THAT I HAVE LEFT OUT.

7        MR. SHAPIRO:  SURE.

8    I THINK YOU ARE ABSOLUTELY CORRECT THAT YOU POINTED OUT

9  QUITE A NUMBER OF DEFECTS IN THE ORIGINAL COMPLAINT WHICH HAVE

10  SIMPLY NOT BEEN ADDRESSED BY PLAINTIFFS IN THIS SECOND

11  ITERATION.  AND IT WOULD BE OUR CONTENTION THAT, IN FACT, IT

12  WOULD BE FUTILE TO AMEND AT THIS POINT, THERE ARE SO MANY

13  DEFECTS IN THIS PLEADING.

14    AND IN FACT, COUNSEL HAS HAD THIS STOCK PURCHASE AGREEMENT

15  IN FRONT OF THEM FROM DAY ONE.  THEY RAISE SOME OF THESE ISSUES

16  IN THEIR ORIGINAL BRIEFING AND HIGHLIGHTED THE FACT THAT THEY

17  MIGHT BE RELYING ON ADDITIONAL ALLEGED MISREPRESENTATIONS.  AND

18  THEN THEY BROUGHT THIS NEW COMPLAINT AND STILL HAVE FAILED TO

19  PLEAD PARTICULAR FACTS TO SUPPORT ANY OF THE ELEMENTS OF THEIR

20  CLAIM.

21    AND JUST TO CUT TO THE CHASE ON THE FUTILITY ARGUMENT,

22  BECAUSE I THINK THAT'S IMPORTANT HERE, YOUR HONOR, TO CONSIDER,

23  THE MOTIVE PIECE IS SIMPLY INSUFFICIENT.  THERE IS NO EVIDENCE

24  BROUGHT TO BEAR HERE THAT THERE WAS A PECUNIARY MOTIVE UNIQUE

25  TO MR. WATSON, THAT WOULD HAVE INCENTIVIZED HIM TO LIE AND MAKE

1    THESE MISREPRESENTATIONS, AND THAT'S REQUIRED.

2         AS WE NOTED IN THE PAST -- AND WE MADE THAT ARGUMENT LAST

3    TIME, YOUR HONOR.  WITHOUT A COMPELLING THEORY OF INTENTIONAL

4    FRAUD, YOU HAVE TO PROVE MOTIVE, AND THERE'S NOTHING HERE ABOUT

5    MOTIVE.

6         MOREOVER, AS YOUR HONOR POINTS OUT, THE NEXT THING THAT

7    THEY HAVE COMPLETELY FAILED TO DO IS FOLLOWING YOUR HONOR'S

8    EXPLICIT INSTRUCTION, FAILED TO MAKE ANY CASE FOR CLICK LOSS.

9         THERE'S ABSOLUTELY NO PARTICULARIZED ALLEGATIONS OF

10   ECONOMIC LOSS HERE.  AND IF THEY CAN'T GET THAT AT THIS POINT,

11   I DON'T THINK THEY ARE EVER GOING TO GET TO THAT POINT.

12        SO ON THOSE TWO POINTS, I THINK THOSE ARE FATAL BLOWS TO

13   THIS COMPLAINT.

14             THE COURT:  WELL, BUT MR. PETERSEN DOES ALLEGE

15    RECISION HERE AS THE ECONOMIC LOSS AS THE VALUE OF THE ENTIRE

16    INVESTMENT.

17             MR. SHAPIRO:  I WOULD LIKE TO ADDRESS THAT,

18    YOUR HONOR, BECAUSE I WILL BE COMPLETELY FRANK, OUR THINKING

19    HAS EVOLVED ON THAT POINT SINCE THE LAST TIME WE BRIEFED THAT

20    AND THIS ROUND.

21        IT IS NOW CLEAR TO ME THAT UNDER NINTH CIRCUIT LAW,

22   RECISION DAMAGES IS A MOTIVE RELIEF THAT DOES NOT OBVIATE THE

23   NEED TO PROVE THE LOSS IN THE FIRST INSTANCE.  THAT IS NOT

24   PROOF OF LOSS, THAT'S A FORM OF RELIEF UNDER AN EQUITABLE

25   DOCTRINE OF RECISION.

1    AND I WOULD LIKE TO BRING TO THE COURT'S ATTENTION A CASE

2    THAT WE HAVE NOW IDENTIFIED, IF I CAN BRING IT TO YOUR HONOR'S

3    ATTENTION, THIS CASE MAKES CLEAR THAT IN A 10(B)(5) CASE,

4    RECISION CLAIM DOES NOT OBVIATE THE NEED FOR SHOWING OF

5    ECONOMIC LOSS.  AND THAT CASE IS STRATEGIC DIVERSITY, INC. V.

6    ALCHEMIX CORP., 666 F.3D 1197, PIN CITE 1207.  AND THAT'S A

7    NINTH CIRCUIT CASE FROM 2012.  NOW WE APOLOGIZE FOR NOT

8    BRINGING THAT UP IN OUR BRIEFING, BUT IT IS DIRECTLY RELEVANT

9    TO THIS POINT.  AND I THINK AGAIN, IT IS DISPOSITIVE OF THIS

10   ENTIRE CASE.

11   SO ON AT LEAST THOSE TWO ELEMENTS, I DON'T THINK THAT ANY

12   AMENDMENT IS REALLY GOING TO ULTIMATELY PASS MUSTER.  THE OTHER

13   PIECE OF THIS IS THE LOSS CAUSATION PIECE.

14   PLAINTIFFS ARE BASICALLY, AND THIS IS EVIDENT BY THEIR

15   SCATTER SHOT APPROACH TO THE MISREPRESENTATIONS, FIRST THEY

16   CHOOSE ONE, THEN THEY CHOOSE ANOTHER FOUR, THERE DOESN'T SEEM

17   TO BE ANY FOCUS OR CONSISTENCY BETWEEN THESE PLEADINGS.

18   AND AT THE END OF THE DAY, I THINK THAT REVEALS THAT THEIR

19   INTENT IS REALLY JUST TO LEVERAGE THE EVENTS OF OCTOBER, THE

20   MEDIA FIRE STORM THAT THEY MENTION, AND USE THAT AS A WAY OF

21   PLEADING BY HINDSIGHT.

22   AND THERE ARE MULTIPLE DECISIONS IN THIS CIRCUIT, WHICH WE

23   HAVE LAID OUT IN OUR BRIEF, YOUR HONOR, WHICH MAKE IT VERY

24   CLEAR THAT YOU CAN'T DO THAT.

25   SO TO SAY THAT A COMPANY FALTERED ON THE REVELATION OF A

1    SCANDAL AND A MISCONDUCT BY AN EMPLOYEE OF THE COMPANY, IS NOT

2    TO SAY THAT THERE WAS FRAUD.  THOSE TWO THINGS DO NOT EQUATE.

3    AND YOU HAVE TO SHOW THAT WHATEVER THE IMPACT WAS ON THE

4    COMPANY, WAS THE RESULT OF THE ACTUAL FACTS, MISREPRESENTED OR

5    ALLEGED TO BE MISREPRESENTED, NOT ABOUT SOME KIND OF RELEVANT,

6    POTENTIALLY RELEVANT FACT THAT HAS NOTHING TO DO WITH THOSE

7    MISREPRESENTATIONS.

8         SO THAT GETS US TO THE REPRESENTATIONS THEMSELVES, WHICH

9    IS THEY HAVE TO PLEAD THAT THE REPRESENTATIONS WERE

10   MISREPRESENTATIONS AND THAT MR. WATSON KNEW IT AT THE TIME, AND

11   THEY FAILED TO DO THAT EITHER.

12        AND AS YOUR HONOR POINTS OUT, THERE'S CERTAIN -- THEY

13   HAVEN'T EXPLAINED WHAT THEY UNDERSTOOD THESE PROVISIONS TO

14   MEAN, WHAT MR. WATSON UNDERSTOOD THOSE PROVISIONS TO MEAN.  WAS

15   THERE A MEETING OF THE MINDS AS TO WHAT THE MEETING WAS?  AND

16   THEN BASED ON THAT MEETING AND THAT DEFINITION, WAS THERE A

17   MISREPRESENTATION?

18        SO YOU HAVE TO START WITH THE DEFINITION, YOUR HONOR.  AND

19   WE HAVE PULLED TOGETHER A NUMBER OF CASES WHICH GIVE PLAUSIBLE

20   AND REASONABLE DEFINITIONS FOR THOSE PROVISIONS.  PARTICULARLY

21   THAT HAVE THE MATERIALLY ADVERSE EFFECT IN THE ORDINARY COURSE.

22   AND COUNSEL DOESN'T DISPUTE THAT.

23        SO WE HAVE A DEFINITION OF MATERIAL ADVERSE EFFECT OUT OF

24   A DISTRICT COURT IN CALIFORNIA, WHICH MAKES CLEAR WHAT THAT

25   TERM MEANS.  THEY HAVEN'T CONTESTED THAT, THEY HAVEN'T

1    SUGGESTED THAT THERE WAS A DIFFERENT UNDERSTANDING BY THE

2    PARTIES TO THIS PARTICULAR CONTRACT.

3         AND THEN YOU'VE GOT THE ORDINARY COURSE PROVISION, WHICH

4    WE ARGUED AT LENGTH HAS TO BE READ IN THE CONTEXT OF THE

5    CONTRACT THAT WAS SIGNED.

6         THIS IS A CONTRACT, AT THE END OF THE DAY, YOUR HONOR, SO

7    YOU HAVE TO READ THE PROVISIONS OF THE CONTRACT IN THE CONTEXT

8    OF THE ENTIRE DOCUMENT.  AND WE HAVE SHOWN AT LENGTH HOW WHAT

9    I'M CALLING THE COLLOQUIAL INTERPRETATION OF ORDINARY COURSE,

10   SIMPLY IS NOT WHAT THE CONTRACT INTENDED AND MEANT.

11        SO AGAIN, I THINK THAT THERE ARE INFIRMITIES, THEY ARE

12   JUST NOT GOING TO BE ABLE TO OVERCOME, AND YET ANOTHER

13   ITERATION OF THIS.  THIS IS SOPHISTICATED COUNSEL WHICH HAS HAD

14   A NUMBER OF BITES AT THE APPLE, THEY HAD THE OPERATIVE CONTRACT

15   IN FRONT OF THEM SINCE DAY ONE, AND THEIR SCATTER SHOT APPROACH

16   TO CHOOSING ONE THEN THE OTHER DOESN'T BUILD CONFIDENCE AS

17   TO -- IN THE THEORY OF FRAUD IN THIS CASE.

18        AND AGAIN, I WOULD NOTE THAT ON THE SCIENTER POINT, THE

19   MOTIVE FACTOR IS --

20            THE COURT:  LET'S FOCUS ON THE ONE REP THAT IS CLEAR,

21   THE KNOWLEDGE PENDING OR IMPENDING RESIGNATIONS OR

22   TERMINATIONS.  THAT'S SOMETHING MR. PETERSEN COULD AMEND ON.

23   AND IF THAT'S A FALSE REP, HE COULD GO FORWARD WITH THAT.

24        SO MR. RAO DID ULTIMATELY RESIGN, I DON'T KNOW WHETHER IT

25   WAS TERMINATION OR RESIGNATION, WE WILL CALL IT A RESIGNATION,

1    AND ALTHOUGH MR. PETERSEN HASN'T ALLEGED WHEN MR. WATSON KNEW

2    THAT THAT WAS IMPENDING, HE -- IF HE TELLS ME TODAY THAT HE HAS

3    ADDITIONAL FACTS THAT WOULD ALLOW HIM TO REASONABLY AMEND THAT,

4    I WOULD HAVE TO LET HIM GO FORWARD.

5        I AGREE WITH YOU THE ORDINARY COURSE, I COULD KIND OF GO

6    EITHER WAY ON IT, BUT IT MAY BE -- IT MAY ACTUALLY DEFY ANY

7    DEFINITION, AS YOU SUGGEST.  BUT I AM CONCERNED ABOUT THE FIRST

8    ONE ON KNOWLEDGE OF THE RESIGNATION.

9            MR. SHAPIRO:  WELL, YOUR HONOR, AS PLED, THERE HAVE

10   BEEN THREE ITERATIONS OF THIS COMPLAINT.  WE HAVE ONLY MOVED TO

11   DISMISS TWO BECAUSE THOSE WERE THE OPERATIVE ONES.

12           THE COURT:  RIGHT.

13           MR. SHAPIRO:  THEY DID NOT COME UP WITH ANY FACTS.

14   AND THE LACK OF PARTICULARITY THROUGHOUT THIS COMPLAINT HAS NOT

15   GIVEN ME CONFIDENCE, YOUR HONOR, THAT THEY ARE GOING TO BE ABLE

16   TO MEET THAT PARTICULARITY HURDLE WITH RESPECT TO THIS FACT.

17       AND AS -- WHAT THEY HAVE RELIED ON, AS YOUR HONOR HAS

18   POINTED OUT, IS A STATEMENT IN OCTOBER THAT HE WAS LET GO, BUT

19   THAT DOESN'T SAY WHEN.  AND I DON'T THINK THEY ARE GOING TO BE

20   ABLE TO MEET THAT HURDLE WITH PARTICULARITY IN YET ANOTHER

21   ITERATION.

22       AT THE VERY LEAST, THE OTHER REPRESENTATIONS NOTED HERE,

23   ULTIMATELY THEY ALSO WILL NOT PASS MUSTER, THEY ARE NOT GOING

24   TO BE ABLE TO PLEAD ANYTHING THAT'S GOING TO PASS MUSTER HERE.

25   BUT EVEN IF THEY WERE ABLE TO ARTICULATE A DEPARTURE, KNOWLEDGE

1    OF A DEPARTURE BY MR. RAO, WE WOULD SUBMIT, YOUR HONOR, THAT

2    AGAIN, THERE'S STILL ALL THE OTHER ELEMENTS THAT ARE MISSING

3    HERE, WHICH IS SCIENTER, MOTIVATION, FINANCIAL MOTIVE ON

4    MR. WATSON'S PART, THAT IS SEPARATE AND DIFFERENT FROM THE

5    GENERALIZED CORPORATE MOTIVES.  THE LOSS CAUSATION, AS WE

6    NOTED, THE ECONOMIC LOSS.  I MEAN, THOSE ARE ELEMENTS THAT THEY

7    COULD HAVE BASICALLY DEVELOPED IN THE PAST NUMBER OF

8    ITERATIONS.

9            THE COURT:  WELL, WE ARE DEALING WITH A FALSE

10   STATEMENT AS OPPOSED TO AN OMISSION.

11       AND I DON'T WANT TO LEAVE OUT THE SECTION 3.12 ON

12   KNOWLEDGE OF ACTION SUITS OR INVESTIGATIONS.  THAT ONE ALSO, IT

13   FAILS NOW FOR THE SAME REASON AS KNOWLEDGE OF THE RESIGNATION,

14   BECAUSE I DON'T HAVE ANY FACTS FOR WHICH I COULD REASONABLY

15   INFER THAT MR. WATSON KNEW ABOUT THE DOJ INVESTIGATION BEFORE

16   THE SPA WAS SIGNED.

17       AND SO, YOU KNOW, BUT I MEAN, I UNDERSTAND THAT YOUR

18   ARGUMENT ABOUT THE ECONOMIC LOSS IS SEPARATE.  BUT IF

19   MR. PETERSEN CAN ARGUE THAT THEY HAD ACTUAL KNOWLEDGE OF EITHER

20   UNDER 3.12 OR OF THE RESIGNATIONS CLAUSE AND DID NOT DISCLOSE,

21   THEN ISN'T THAT -- IT IS A FALSE STATEMENT THAT THEY HAVE MADE,

22   IT'S NOT JUST AN OMISSION.

23            MR. SHAPIRO:  WELL, YOUR HONOR, IF THEY COULD

24   ESTABLISH THAT, THEY MAY GET TO FALSITY, BUT THERE'S A LOT OF

25   OTHER ELEMENTS THAT, AS WE HAVE -- AS I HAVE ARGUED --

1          THE COURT:  IT'S NOT VERY HARD, I MEAN, THE CEO IS

2     THE ONE THAT'S GOING TO KNOW IF THE COO HAS ONE FOOT OUT THE

3     DOOR, SO SCIENTER IS NOT GOING TO BE VERY HARD THERE, I THINK.

4          THEN I'VE NEVER FOUND A CASE WHERE CORE OPERATIONS THEORY

5     WORKED, BUT THAT WOULD BE ONE, I THINK.  I DON'T THINK IT WOULD

6     BE HARD FOR MR. PETERSON TO ALLEGE CORE OPS ON RESIGNATION OF

7     YOUR RIGHT-HAND COFOUNDER PERSON.

8          MR. SHAPIRO:  WELL, YOUR HONOR, I WOULD RESPECTFULLY

9     DISAGREE THAT THERE ARE A NUMBER OF OTHER ELEMENTS THAT THEY

10    ARE NOT GOING TO BE ABLE TO ESTABLISH.

11         BUT WITH REGARD TO THE GOVERNMENT INVESTIGATIONS, THERE IS

12    ACTUALLY EVIDENCE NOW IN THE RECORD OF AN ANCILLARY CASE WHICH

13    WE BROUGHT TO THE COURT'S ATTENTION IN OUR BRIEFING, THERE'S AN

14    INSURANCE CASE GOING FORWARD, THE CLEAR BLUE INSURANCE CASE

15    AGAINST THE COMPANY FOR RECISION OF THE INSURANCE CONTRACT.

16    AND IN THE CONTEXT OF THAT CASE, IT WAS MADE EVIDENT THE DATES

17    OF THE SUBPOENAS THAT WERE SERVED BY THE GOVERNMENT.

18         THE COURT:  SURE.  THAT I KNOW, I UNDERSTAND THAT.

19         BUT THE DATE OF THE SUBPOENA MAY BE THE FIRST TIME THAT

20    OZY WAS AWARE OF THE AN INVESTIGATION, BUT IT MAY NOT BE.  IT

21    MAY BE THAT THE SUBPOENAS CAME AFTER LENGTHY DISCUSSIONS WITH

22    THE COMPANY OR AN INFORMAL DEMAND HAD BEEN MADE.

23         SO THAT'S WHERE I -- YOU KNOW, THAT'S GOOD EVIDENCE, BUT I

24    WOULD LET MR. PETERSEN DECIDE WHETHER HE CAN ALLEGE ANYTHING

25    THAT PREDATES THOSE SUBPOENAS AND PREDATES THE SPA'S.

1           MR. SHAPIRO:  YOUR HONOR, ANYTHING IS POSSIBLE.  I

2    THINK THAT SUGGESTS THAT IT'S HIGHLY UNLIKELY THAT THEY WOULD

3    COME UP WITH A PLAUSIBLE PARTICULAR ALLEGATION.

4           THE COURT:  SO I GUESS IN MY READING OF NINTH CIRCUIT

5    LAW, WHEN NEW THEORIES DO COME FORWARD, I AM REALLY PRETTY MUCH

6    COMPELLED TO GIVE THE PLAINTIFF ANOTHER CHANCE IF HE CAN ASSURE

7    ME THAT HE HAS THE INFORMATION THAT WOULD ALLOW A REASONABLE

8    AMENDMENT.

9           MR. PETERSEN WILL TELL ME THAT, AND HE KNOWS THAT'S HIS

10   JOB HERE.  BUT NOT GIVING THEM ANOTHER CHANCE ON AT LEAST THOSE

11   TWO THEORIES IS A TOUGH ONE.

12          AND ON ECONOMIC LOSS, I WANT TO HEAR HIS ARGUMENT ON THAT.

13   YOU KNOW, I THINK -- AS I SAY, THIS CASE IS ABOUT, IS REALLY

14   ONLY ABOUT WHAT MR. RAO DID IN THE IMPERSONATION, IS WHETHER

15   THAT CAUSED ANYTHING.  IT CERTAINLY CAUSED GOLDMAN TO WITHDRAW

16   ITS INVESTMENT, THERE'S NO QUESTION, BUT THAT FACT WAS MADE

17   CLEAR.  YOU ARGUED THAT SEVERAL TIMES IN YOUR PAPERS, AND I

18   THOUGHT IT APPROPRIATELY, BECAUSE I THINK THAT IS REALLY KEY,

19   IF THEY HAD NOT DISCLOSED THE GOLDMAN CHANGE OF HEART, THEN

20   THIS WOULD BE A WHOLE DIFFERENT CIRCUMSTANCE, YOU MIGHT HAVE

21   JUST FILED AN ANSWER.

22          MR. SHAPIRO:  YOUR HONOR, I AM VERY INTERESTED TO

23   HEAR WHAT COUNSEL IS GOING TO SAY ON THESE POINTS.

24          I REITERATE OUR POSITION HERE WHICH IS THAT THIS IS A

25   SOPHISTICATED INVESTOR, SOPHISTICATED COUNSEL, AND THEY HAD

1    EVERY OPPORTUNITY TO MAKE THEIR CASE AND THEY FAILED TO DO SO.

2         THE COURT:  ALL RIGHT.

3         MS. WEST, ON BEHALF OF MR. WATSON, DID YOU WANT TO MAKE

4    ANY OTHER COMMENTS?

5         MS. WEST:  I AM SATISFIED WITH THE ARGUMENTS THAT

6    HAVE ALREADY BEEN MADE BY COUNSEL, AND WE WILL SUBMIT ON THAT.

7    THANK YOU, YOUR HONOR.

8         THE COURT:  GOOD.  THANK YOU.

9         MR. GUGELMANN, I'M GOING TO TURN TO YOU SO THAT

10   MR. PETERSEN CAN RESPOND ONCE.

11        FOR MR. RAO, WE REALLY ACTUALLY HAVE, IT'S AN ENTIRELY

12   DIFFERENT THEORY OF LIABILITY.  SO LET ME HEAR YOUR ARGUMENT.

13        MR. GUGELMANN:  THANK YOU, YOUR HONOR.

14   JUST TO PICK UP BRIEFLY ON THE SUBJECT THAT THE COURT WAS

15   JUST DISCUSSING WITH MR. SHAPIRO, AT LEAST ONE OF THESE CLAIMS

16   THAT THE COURT IS SAYING COULD POSSIBLY BE AMENDED, ISN'T

17   ACTUALLY A NEW THEORY.

18        THE INVESTIGATION WAS ALLEGED REPEATEDLY IN THE FIRST

19   AMENDED COMPLAINT.  NOW THEY DIDN'T HAVE THE FACTS THEN TO

20   BRING A CLAIM BASED ON THAT INVESTIGATION, BUT I WOULD SUBMIT

21   THAT THE IDEA THAT NOW ON THE FOURTH ATTEMPT, IT'S NOT THAT THE

22   ALLEGATION, THE CLAIM THAT THERE WAS AN INVESTIGATION ONGOING

23   IS NEW TO THEM.  THEY SAY IN THE FIRST AMENDED COMPLAINT THAT

24   THERE WAS A FAILURE TO DISCLOSE AN INVESTIGATION AT THE TIME OF

25   THE SPA.  SO I DON'T THINK THERE'S ANY INDICATION HERE, TO THE

1      COURT'S POINT, THAT IT'S A NEW THEORY THAT SHOULD BE COMPELLED.

2              THE COURT:  THANK YOU.

3              MR. GUGELMANN:  ON THE ISSUES THAT ARE SPECIFIC TO

4      MR. RAO, OBVIOUSLY ALL THE POINTS THAT MR. SHAPIRO MAKES FOR

5      MR. WATSON AND THEN APPLY TO THE COMPANY, APPLY TO MR. RAO AT

6      ALL.  AND SO I DON'T NEED TO SUPPLEMENT OR ADD TO ANYTHING THAT

7      HE SAID THERE.

8              AND THE COURT, I THINK, HAS IDENTIFIED THE PROBLEM WITH

9      RESPECT TO MR. RAO.  THE KIND OF SCATTERSHOT NATURE OF THIS

10     PLEADING WAS EVIDENT AS TO MR. RAO TOO.  I THINK IT'S QUITE

11     CLEAR THE SECOND AMENDED COMPLAINT PURPORTS TO BE ABOUT

12     OMISSIONS BY MR. RAO.  THAT'S NOT A VIABLE THEORY, AND I THINK

13     THAT THEORY HAS DROPPED AWAY IN THE COURSE OF THIS BRIEFING.

14             BUT THE ALLEGATIONS IN THE SECOND AMENDED COMPLAINT AS TO

15     MR. RAO ARE, YOU FAILED TO DISCLOSE THIS, YOU FAILED TO

16     DISCLOSE THAT, AND EVEN EXPLICITLY SAYS YOU ARE LIABLE, MR. RAO

17     IS LIABLE BECAUSE HE FAILED TO DISCLOSE.

18             AND SO WHAT'S IN THERE TO SUPPORT NOW THIS, I THINK SORT

19     OF THIRD THEORY AGAINST MR. RAO OF DISSEMINATION, IS ONLY THE

20     FACT THAT HE SENT AN E-MAIL.  AND I THINK THE COURT HAS

21     IDENTIFIED THE PROBLEM WITH THAT.  THERE JUST IS NOTHING THERE,

22     THERE'S NO ALLEGATION THAT HE DRAFTED, THERE'S NO ALLEGATION

23     THAT HE NEGOTIATED THOSE TERMS, THERE'S NO ALLEGATION THAT HE

24     EVER DISCUSSED THOSE TERMS WITH THE PLAINTIFFS.

25             THERE'S NO ALLEGATION THAT HE READ THE SPA, AND THERE'S

1      CERTAINLY NOTHING, EVEN IF HE HAD READ THE SPA, EVEN IF THERE

2      WAS AN ALLEGATION TO THAT EFFECT, HE'S NOT A LAWYER.

3          THESE ARE SPECIFIC REPRESENTATIONS THAT ARE IN FOUR

4      SUBSECTIONS OF A REALLY DENSE DOCUMENT AND THAT ARE SUBJECT TO

5      MODIFICATION BY A SCHEDULE OF EXCEPTIONS THAT THERE IS NO

6      ALLEGATION THAT HE EVER SAW OR SENT.

7          SO WE DON'T, AS TO MR. RAO, EVEN HAVE AN ALLEGATION THAT

8      THE COMPLETE DOCUMENT WAS IN HIS HANDS, THAT HE READ THE

9      COMPLETE DOCUMENT OR THAT HE REASONABLY UNDERSTOOD THE

10     SPECIFICS OF THESE VERY PARTICULAR REPRESENTATIONS THAT ARE IN

11     THE SUBSECTIONS OF SECTION 3 OF THE TWO SPA'S.

12         SO I THINK THE COURT HAS HEARD THAT ARGUMENT, AND I THINK

13     WE WOULD SUBMIT ON THAT.

14             THE COURT:  OKAY.  THAT'S HELPFUL.  THANK YOU.

15         ALL RIGHT.  MR. PETERSEN, YOU KNOW, I'M NOT ON OPPOSED TO

16     GIVING YOU A REASONABLE CHANCE TO AMEND, BUT YOU HAVE TO ASSURE

17     ME THAT YOU CAN MAKE THOSE AMENDMENTS.

18         AND I THINK ON THE ECONOMIC LOSS, THAT'S GOING TO BE HARD.

19     ON SOME OF THE OTHERS, AS I SAID, IT'S MY FIRST TIME THROUGH

20     WITH THIS, SO I FEEL THAT THE NINTH CIRCUIT WOULD ACTUALLY

21     REQUIRE ME TO GIVE YOU THAT OPPORTUNITY.

22             MR. PETERSEN:  YOUR HONOR, THERE WAS OBVIOUSLY A LOT

23      TO ADDRESS DEALING WITH THREE DEFENDANTS, SO I WILL GO THROUGH

24      AND ATTEMPT TO TRACK WHAT YOUR HONOR STARTED WITH FOLLOWED BY

25      MR. SHAPIRO, FOLLOWED BY MR. GUGELMANN'S ARGUMENT.

1      NOW IN THE FIRST INSTANCE, PLAINTIFF AGREES THAT THE FACT

2   THAT GOLDMAN SACHS FAILED TO DISCLOSE -- FAILED TO INVEST,

3   EXCUSE ME, IS NOT IN ITSELF ACTIONABLE, IN A VACUUM.

4      AND PART OF THE PROBLEM HERE, WITH RESPECT TO THE

5   OPPOSITION, IS IT'S CHERRY PICKING AND TAKING ALLEGATIONS IN A

6   VACUUM AND SAYING CONCLUSORY, THEREFORE YOU DON'T MAKE A

7   SPECIFIC ALLEGATION BECAUSE WE ARE CHOOSING ONE ALLEGATION OUT

8   OF THE ENTIRE SECOND AMENDED COMPLAINT, AND IT'S CONCLUSORY.

9      WELL, THE FACT IS WHEN YOU LOOK -- THE FAILURE TO

10  DISCLOSE -- I'M SORRY, MY LIGHTS WENT OFF, YOUR HONOR.  THE

11  FAILURE TO DISCLOSE THE INCIDENT AS BECAUSE OF THE FAILURE TO

12  INVEST RENDERED THE REPRESENTATIONS AT ISSUE FALSE OR

13  MISLEADING, THAT'S THE ACTIONABLE CONDUCT.  IT'S NOT THAT

14  GOLDMAN SACHS DIDN'T INVEST, WE DON'T DISPUTE THAT THEY

15  DISCLOSED THAT GOLDMAN SACHS FAILED TO INVEST.

16      THE COURT:  I GUESS I DON'T ACTUALLY UNDERSTAND THAT

17   THEORY.  AND I ALSO AM CONCERNED THAT YOUR THEORY OF THIS NEED

18   TO DISCLOSE THE UNDERLYING REASON FOR THE FAILURE OF THE

19   INVESTMENT IS A VERY BIG PROPOSITION FOR COMPANIES TO HAVE TO

20   ONE, DISCERN THE WHAT THE REASON THEIR INVESTORS WALK AWAY IS,

21   AND THEN ARTICULATE IT TO OTHERS.

22      THE CONVERSATIONS BETWEEN INVESTOR GOLDMAN SACHS AND OZY,

23   ARE NOT PUBLIC DISCUSSIONS, AND THE OUTCOME OF THOSE

24   DISCUSSIONS IS SOMETHING THAT'S MATERIAL TO THE COMPANY, BUT

25   THE REASONS FOR IT, IT COULD BE -- I MEAN, IT COULD BE

1    SOMETHING VERY PERSONAL, IT COULD BE SOMETHING SALACIOUS, IT

2    COULD BE A LOT OF THINGS, OR IT COULD BE SOMETHING, THIS WAS

3    BUSINESS-ORIENTED, NOT BASED ON WE USED TO BE FRIENDS AND YOU

4    DOUBLE-CROSSED ME AND I'M NOT GOING TO INVEST WITH YOU ANYMORE.

5        YOU ARE NOT -- THIS DOESN'T DRAW A LINE, THIS OPENS THE

6    DOOR TO WHAT I THINK THE NINTH CIRCUIT HAS SAID NO TO, TO

7    HAVING TO TELL YOUR INVESTORS WHY YOU'VE LOST THE INVESTMENT,

8    WHY YOUR BUSINESS DIDN'T GO AS WELL AS YOU THOUGHT.  I DON'T

9    THINK THAT'S THE LAW.

10       THIS IS A SHOCKING CIRCUMSTANCE, THERE'S NO QUESTION, BUT

11   BEYOND THAT, LOSING AN INVESTMENT IS LOSING AN INVESTMENT, WHY

12   IS LOSING IT BECAUSE OF IMPERSONATION DIFFERENT?

13       MR. PETERSEN:  LOSING IT BECAUSE OF THE IMPERSONATION

14    RENDERED THE STATEMENT AT ISSUE, AS ALLEGED FALSE OR

15    MISLEADING.

16       THE COURT:  HOW?  I DON'T GET THAT.  I GUESS I'M NOT

17    UNDERSTANDING.

18       MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

19       I WILL ADDRESS THAT POINT.  BUT TO GO BACK THE SECOND

20   AMENDED COMPLAINT AT PARAGRAPHS 51 AND 52, INDICATE OR ALLEGE

21   THAT MR. WATSON, AS CONFIRMED IN THE RADIO INTERVIEW, KNEW THE

22   VERY DAY THAT THE INCIDENT OCCURRED, THAT GOLDMAN SACHS FAILED

23   TO INVEST BECAUSE OF THE INCIDENT.

24       THE COURT:  I AGREE WITH YOU ON THAT.  NO, I THINK

25    THAT'S A GIVEN.  NO ONE IS ARGUING OTHERWISE, THAT THAT WAS THE

1    REASON.

2         I'M SAYING THAT I DON'T KNOW OF ANY LEGAL OBLIGATION TO

3    TELL OTHER INVESTORS WHY AN INVESTOR PULLS OUT.  THE FACT THAT

4    GOLDMAN PULLED OUT, WAS DISCLOSED IMMEDIATELY, YOU MAKE THAT

5    CLEAR IN YOUR PLEADINGS.

6         MR. PETERSEN:  SURE.

7         AND YOUR HONOR, AGAIN, I WILL GO TO THE ISSUES OF EACH OF

8    THE ALLEGED REPRESENTATIONS THAT WERE RENDERED FALSE OR

9    MISLEADING.  AND AGAIN, THE THEORY --

10        THE COURT:  SORRY TO INTERRUPT, BECAUSE WHAT IF, IN

11   THESE CONVERSATIONS, IT WASN'T GOLDMAN SACHS, BUT IT WAS

12   SOMEONE ELSE WHO SAID, WE WERE ALL READY TO INVEST, WE'VE HAD A

13   REVERSAL OF FORTUNE IN OUR COMPANY, YOU CAN'T DISCLOSE THIS TO

14   ANYONE, WE ARE GOING BROKE BECAUSE WE CAN'T INVEST.  IS THERE A

15   DUTY TO DISCLOSE THAT?  NOW WE HAVE CONFIDENTIAL INFORMATION,

16   THIS A BUSINESS CONVERSATION.

17        SO THAT'S WHY I'M SAYING YOUR THEORY THAT THERE'S A DUTY

18   TO DISCLOSE THE REASON BLEEDS INTO SO MANY AREAS THAT WE WOULD

19   SAY NO, THAT I CAN'T DRAW A LINE, AND THE NINTH CIRCUIT HAS

20   NEVER DRAWN THAT LINE.

21        MR. PETERSEN:  AND AGAIN, YOUR HONOR, I AGREE IN A

22   VACUUM.  BUT WHEN THAT RENDERS THAT SPECIFIC AFFIRMATIVE

23   REPRESENTATION FALSE OR MISLEADING -- AND ONE OF THE ISSUES,

24   YOUR HONOR, THAT I BELIEVE, AS MR. SHAPIRO RAISED, AND IT'S SET

25   FORTH THROUGHOUT THE BRIEFING, IS IT'S THIS NOTION OF ABSOLUTE

1    FALSITY.  THAT'S NOT WHAT'S REQUIRED TO PLEAD AN OMISSION

2    THEORY, AN OMISSION THEORY IS FALSE OR EVEN MISLEADING.

3         SO THE FACT THAT WHETHER IT WAS FALSE OR NOT, IS NOT THE

4    TEST.  THE FACT -- THE TEST IS WHETHER OR NOT THE FAILURE TO

5    DISCLOSE RENDERED THE FOUR REPRESENTATIONS WE'VE ALLEGED AT

6    ISSUE, MISLEADING.

7              THE COURT:  OKAY.

8              MR. PETERSEN:  AND GOING TO YOUR HONOR'S POINT ON --

9    I WOULD LIKE TO START WITH 3.6(M), THE ORDINARY COURSE

10   PROVISION.

11        NOW THE ARGUMENT BY MR. SHAPIRO AND THE OTHER DEFENDANTS

12   IN THIS CASE IS THAT 3.6(M) IS TIED SOMEHOW TO THE FINANCIAL

13   STATEMENTS AS ITS DEFINED IN SECTION 3.5 OF THE SPA'S.  THAT'S

14   SIMPLY NOT SUPPORTED, YOUR HONOR.  THERE'S NO CONNECTION

15   BETWEEN THE PLAIN READING OF 3.6(M) AND SECTION 3.5.  AND

16   THAT'S SUPPORTED, ACTUALLY, IF YOU LOOK AT SECTION 3.6(A) WHICH

17   SPECIFICALLY TALKS ABOUT AND REFERENCES FINANCIAL STATEMENTS.

18        SO WHEN THE COMPANY WANTED TO MAKE SURE THAT THE

19   DISCLOSURE OR THE REPRESENTATION AT ISSUE IMPACTED OR WAS TIED

20   TO THE FINANCIAL STATEMENTS, IT EXPRESSLY DID SO.  3.6(A) IS A

21   VERY CLEAR EXAMPLE OF THAT.  WHEN THE COMPANY DID NOT INTEND TO

22   TIE THE REPRESENTATIONS SPECIFICALLY TO FINANCIAL STATEMENTS,

23   IT DIDN'T DO SO.  THAT IS SECTION 3.6(M).

24        SO IF THE ARGUMENT THAT 3.6(M), THE ORDINARY COURSE

25   PROVISION, IS SOMEHOW QUALIFIED OR TIED TO OR REQUIRES A

1    SHOWING OF AN IMPACT ON A FINANCIAL STATEMENT, AS IT'S DEFINED

2    IN THE AGREEMENT, THEN WHERE WHY IS THERE 3.6(A).  IT READS

3    3.6(A) OUT OF THE AGREEMENT ENTIRELY.

4         AND YOUR HONOR, WE WOULD ARGUE THAT --

5              THE COURT:  IF I AGREE WITH YOU THERE, THE DEFENDANTS

6    ALSO CITE A LINE OF CASES THAT ORDINARY COURSE HAS NO MEANING

7    WHATSOEVER, AND SO YOU CAN'T READ ANY FALSITY OR MISLEADING

8    OMISSIONS THEORY INTO IT, IT'S VIRTUALLY A MEANINGLESS CLAUSE,

9    ESPECIALLY WITH A ONE-OFF INCIDENT.

10             MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

11        AND I DON'T DISAGREE IN A VACUUM.  AND ACTUALLY, THERE IS

12   A BOILER PLATE ORDINARY COURSE PROVISION, IT'S 3.6(A).  3.6(A)

13   SAYS ORDINARY COURSE, PERIOD.  3.6(M) SPECIFICALLY QUALIFIES

14   AND DEFINES ORDINARY COURSE FOR PURPOSES OF THAT

15   REPRESENTATION.

16        AND IT'S COMPLETELY IGNORED BY THE DEFENDANTS IN THEIR

17   PAPERS, THAT ORDINARY COURSE UNDER SECTION 3.6(M) IS

18   SPECIFICALLY DEFINED TO BE CONSISTENT WITH PAST PRACTICES.

19        UNDER NO CIRCUMSTANCES WHEN YOU READ THE SECOND AMENDED

20   COMPLAINT IN ITS ENTIRETY, CAN IT BE DISPUTED THAT THIS WAS NOT

21   CONSISTENT WITH THE COMPANY'S PAST PRACTICE.

22             THE COURT:  SO I GUESS, AGAIN, YOUR ARGUMENT MAYBE

23    PROVES TOO MUCH, BECAUSE THIS INCIDENT WAS, AS MR. WATSON SAID,

24    HORRIFIC AND SHOCKING, BUT WHERE AM I DRAWING THE LINE?

25        YOU PULLED TOO MUCH WITH YOU.  IF IT CAN BE A ONE-OFF

1    INCIDENT THAT NEVER HAPPENED BEFORE, DO THEY HAVE TO DISCLOSE,

2    WE LOST THE INVESTMENT BECAUSE MY ASSOCIATE SPILLED HIS GLASS

3    OF WATER OVER THE PAPERS AND THE COMPANY GOT SO ANNOYED THEY

4    WALKED OUT THE DOOR?  THAT'S NOT ORDINARY COURSE TO HAVE AN OAF

5    IN THE ROOM.  BUT, YOU KNOW, I TRIVIALIZE IT, BUT THAT'S THE

6    PROBLEM HERE.

7           MR. PETERSEN:  AND YOUR HONOR, MY RESPONSE TO THAT

8    WOULD BE THIS IS NOT -- IF YOU READ THE SAC IN ITS ENTIRELY AND

9    COLLECTIVELY, THIS IS NOT NECESSARILY A ONE-OFF INCIDENT.  WHAT

10   THIS DID, THIS INCIDENT LEAD TO A DOMINO EFFECT THAT BRINGS US

11   HERE TODAY.

12          THE COURT:  WHAT ELSE WAS OUT OF THE ORDINARY COURSE

13   OF BUSINESS?

14          MR. PETERSEN:  ABSOLUTELY, YOUR HONOR.

15      AND THE MAIN ISSUE HERE IS, AS ALLEGED IN THE SECOND

16   AMENDED COMPLAINT, PRIOR TO THE INCIDENT, THE ENTIRE

17   SOLICITATION PROCESS WAS A PROPOSED SERIES D INVESTMENT AT A

18   VALUATION OF APPROXIMATELY $300 MILLION.

19      WITHIN DAYS OF THE INCIDENT CLOSING, CARLOS WATSON

20   CONTACTED LIFELINE AND SAID, WE CAN REOPEN A SERIES C

21   INVESTMENT ROUND THAT HAS BEEN CLOSED FOR 17 MONTHS AT A

22   VALUATION LESS THAN HALF OF WHAT WE WERE SOLICITING FROM YOU

23   FOR THE SERIES D.

24      THERE IS A TEMPORAL CONNECTION BETWEEN THE INCIDENT

25   OCCURRING, MR. WATSON IMMEDIATELY CALLING THE BOARD OF

1    DIRECTORS AND CURRENT INVESTORS, BUT NOT THE INVESTORS HE'S

2    SOLICITING AT THAT MOMENT.  HE CALLS LIFELINE, SAYS, I GOT A

3    SWEET DEAL FOR YOU, I'M GOING TO SOMEHOW REOPEN A 17-MONTH-OLD

4    SERIES C ROUND OF FUNDING AT LESS THAN FIFTY PERCENT OF THE

5    VALUATION I HAVE BEEN SOLICITING YOU ON FOR THE LAST SEVERAL

6    MONTHS.

7         THAT IS NOT IN THE ORDINARY COURSE OF BUSINESS,

8    YOUR HONOR.  THAT'S THE ALLEGATION.  THAT IS NOT CONSISTENT

9    WITH THE COMPANY'S PAST PRACTICES.  IT IS SOLICITING A SERIES D

10   INVESTMENT AT $300 MILLION.  IT THEN REOPENS, TO GET A QUOTE,

11   AND IT'S ALLEGED IN THE SAC, IMMEDIATE AND IMPORTANT INVESTMENT

12   FROM LIFELINE OF $2 MILLION.

13        THE COURT:  SO I JUST -- WOULD YOU POINT ME TO THE

14   PARAGRAPHS IN THE SECOND AMENDED COMPLAINT WHERE YOU MAKE THAT

15   CONDUCT PART OF THE OUT OF THE ORDINARY COURSE ALLEGATION?

16        MR. PETERSEN:  YOUR HONOR, THOSE ALLEGATIONS ARE

17   SPECIFICALLY AT -- I'M SORRY, YOUR HONOR, LET ME --

18        THE COURT:  I'M SORRY TO DO THAT TO YOU.  I WANT TO

19   BE SURE THAT'S WHAT YOU ACTUALLY ALLEGED, AND I WANT TO BE SURE

20   I DON'T OVERLOOK IT BECAUSE I HAVE NOT READ IT AS CAREFULLY AS

21   YOU HOPE I WOULD.

22        MR. PETERSEN:  ABSOLUTELY, YOUR HONOR.  JUST GIVE ME

23   ONE SECOND, IF YOU WOULD.

24        YOUR HONOR, THAT WOULD START AT PARAGRAPH 12, AND RUN

25   THROUGH PARAGRAPH 15, WHICH HAS THE SPECIFIC NUMBERS OF

1    VALUATIONS FOR THE SERIES D AND SERIES C INVESTMENTS.

2         AND IT ALSO FOLLOWS AT -- THOSE ALLEGATIONS ARE ALSO

3    REFERENCED AT 51 THROUGH 58.  THERE ARE ALLEGATIONS THAT

4    MR. WATSON DID REOPEN THE SERIES C FOR AN IMMEDIATE AND

5    IMPORTANT INVESTMENT BECAUSE OF WHAT HAD JUST OCCURRED THAT WAS

6    OUT OF THE ORDINARY COURSE AND HAD A MATERIAL ADVERSE EFFECT ON

7    THE COMPANY.

8         THE COURT:  AND THEN DO YOU RELATE IT IN -- SO I'M

9    LOOKING AT PARAGRAPH 77 THAT YOU SAY THAT 3(M) WAS FALSE, OR

10   MISLEADING BECAUSE RAO KNEW THE REPRESENTATION WAS FALSE

11   BECAUSE HE HAD ENGAGED IN THE IMPERSONATION INCIDENT.  RAO KNEW

12   THE IMPERSONATION INCIDENT WAS NOT HOW OZY ORDINARILY CONDUCTED

13   BUSINESS.

14        SO I'M JUST LOOKING TO SEE IF YOU'VE ACTUALLY ALLEGED,

15   DRAWN THE LINE FROM THE SWITCH TO SERIES C, TO CAUSING 3(M) TO

16   BE MISLEADING.  AND THAT'S WHAT I MISSED, AND PARAGRAPH 77

17   IS -- AND MAYBE THERE'S SOMETHING ELSE FURTHER HERE ABOUT 3(M),

18   BUT I'M NOT SEEING IT.

19        MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

20        AND SO TO THE EXTENT THAT SPECIFIC LINE OR CONNECTION IS

21   NOT IN WHAT WOULD BE AS TO THE COMPANY, I BELIEVE THAT'S

22   PARAGRAPH 64, IT FOLLOWS AS TO MR. WATSON AND MR. RAO, I WOULD

23   SAY ONE, THE SPECIFIC ALLEGATIONS PREVIOUSLY ALLEGED ARE

24   INCORPORATED INTO THE CAUSE OF ACTION.  THAT'S, FOR EXAMPLE,

25   PARAGRAPH 59, THE FIRST PARAGRAPH OF EACH CAUSE OF ACTION,

1        INCORPORATES THOSE SPECIFIC ALLEGATIONS.

2            THE COURT:  BUT, YOU KNOW, I DON'T ACTUALLY THINK --

3    YES, YOU DEFINITELY INCORPORATED BY REFERENCE, THERE'S NO

4    QUESTION, BUT WHEN YOU'VE GOT FOUR FALSE STATEMENTS OR

5    MISLEADING, YOUR OBLIGATION IS TO DRAW THE LINE AS TO WHAT

6    FACTS MAKE THAT REPRESENTATION FALSE, AND FOR YOU TO SIMPLY SAY

7    EVERYTHING IN MY BASKET ISN'T GOOD ENOUGH.

8        SO YOU NEED TO ACTUALLY TELL ME WHICH FACTS -- SO I DON'T

9    ACTUALLY THINK YOU'VE ALLEGED THAT THE SWITCH TO SERIES C WAS

10   OUT OF THE ORDINARY COURSE.  AND I MEAN -- AND SO, I JUST AM

11   NOT SEEING THAT HERE IN THE PLEADINGS WHERE I WOULD EXPECT TO

12   SEE IT.  AND I DON'T SEE IN PARAGRAPH 64.

13       SO IN 64, I CAN'T REASONABLY SAY THAT THE 3.6(M)

14   ALLEGATION IS BASED ALL ON THE SWITCH TO SERIES C.  SO THAT'S A

15   PROBLEM.  MR. SHAPIRO, MY COMMENT ON THAT, YOU WILL PROBABLY

16   AGREE WITH ME NOW, YOU PROBABLY ALWAYS DID AGREE WITH ME ON

17   THAT, BUT THAT'S -- YOU KNOW, IT'S ALWAYS DIFFICULT FOR ME WHEN

18   I READ YOUR OPPOSITION TO WHAT YOU BELIEVE OR WISHED YOUR

19   PLEADING SAID, AND THEN I'VE GOT TO GO BACK TO THE TRUTH SERUM

20   OF THE PLEADING ITSELF.

21       I'M GLAD TO GIVE YOU LEAVE IT AMEND, BECAUSE WHEN YOU LAY

22   OUT A THEORY IN YOUR PAPERS THAT LOOKS LIKE YOU CAN ALLEGE IT

23   FACTUALLY, I LET YOU DO THAT.  BUT I HAVE TO HONE TO WHAT YOU

24   PLED.  I MEAN, I JUST GRANTED SUMMARY JUDGEMENT IN A CASE WHERE

25   THE WHOLE THEORY CHANGED AND I WAS THE ONLY ONE WHO HAD READ

1       THE COMPLAINT RECENTLY.

2              SO ALL RIGHT.  GO AHEAD.

3              MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

4       AND OBVIOUSLY THAT WAS THE INTENT.  AND TO THE EXTENT THAT

5       THE INTENT WAS -- DID NOT REFLECT ITSELF THROUGHOUT THOSE

6       SPECIFIC ELECTIONS IN EACH OF THE CLAIMS, WE WOULD REQUEST

7       LEAVE TO AMEND, BECAUSE PART OF THE OUT OF THE ORDINARY COURSE

8       NOT CONSISTENT WITH PAST PRACTICE, IS THIS SPECIFIC SWITCH FROM

9       D TO C FOR A QUOTE "IMPORTANT AND IMMEDIATE INVESTMENT."

10             THE COURT:  GOOD.  SO MAYBE WE CAN MOVE ON FROM

11      ORDINARY COURSE.

12             MR. PETERSEN:  YES, YOUR HONOR.

13             THE COURT:  SO THERE WERE TWO -- ON THE RESIGNATIONS

14      AND TERMINATIONS, AND ON THE KNOWLEDGE OF INVESTIGATIONS, THE

15      PROBLEM I SEE IS EXACTLY THE SAME, IS THAT I JUST DON'T HAVE

16      ANY FACTS FROM WHICH I COULD INFER THAT KNOWLEDGE BEFORE THE

17      SPA'S WERE SIGNED.  AND I THINK IT'S GOING TO BE PARTICULARLY

18      HARD TO ALLEGE FACTS FOR THE FIRST SPA, BECAUSE THAT CAME ONLY

19      WEEKS AFTER THE INCIDENT.

20             DO YOU BELIEVE YOU HAVE FACTS THAT YOU CAN ALLEGE THAT

21      WILL ALLOW ME TO DRAW THAT REASONABLE INFERENCE?

22             MR. PETERSEN:  YOUR HONOR, WITH RESPECT TO THE

23      RESIGNATION ISSUE, THE KEY LANGUAGE THAT LIFELINE IS RELYING

24      UPON IS "IMPENDING RESIGNATION."

25             THE COURT:  I UNDERSTAND THAT, YES.

1          MR. PETERSEN:  THANK YOU.

2          AND NOW THE FACTS, AS THEY ARE ALLEGED, IS ON OCTOBER 5TH,

3    2021, MR. WATSON INDICATED THAT MR. RAO HAD BEEN ASKED TO

4    RESIGN.

5          THE COURT:  YES.

6          MR. PETERSEN:  YOUR HONOR, I WILL BE FRANK WITH YOU,

7    BECAUSE IT IS A PRIVATE COMPANY, WE DON'T HAVE SPECIFIC FACTS

8    AT THIS STAGE THAT WOULD INDICATE THAT MR. WATSON ASKED MR. RAO

9    ON FEBRUARY 2ND, FEBRUARY 4TH, FEBRUARY 9TH, WHATEVER DATE IT

10   MAY BE.  BUT THE ISSUE BECOMES THE WAY THAT -- THE ALLEGATION

11   IS THE WAY THAT MR. WATSON COUCHED HIS ADMISSION DURING THAT

12   INTERVIEW WAS IN THE PAST TENSE THAT THIS WAS -- WHEN READ IN

13   ITS ENTIRETY, THE SAC LEADS ITSELF TO AN INFERENCE, AT LEAST,

14   THAT IT WAS AN IMMEDIATE, OR A VERY SHORTLY THEREAFTER.

15         BECAUSE MR. WATSON SAYS IT'S HORRIFIC, IT WASN'T GOOD, I

16   IMMEDIATELY CALLED THE BOARD OF DIRECTORS, I IMMEDIATELY CALLED

17   CURRENT INVESTORS.  WE ASKED HIM TO STEP DOWN.

18         THE INFERENCE THERE IS THEY DIDN'T DO ALL OF THESE THINGS

19   AND THEN WAIT NINE MONTHS AND SAY, OKAY MR. RAO, WE WANT YOU TO

20   LEAVE.  THE INFERENCE IS IT WAS AN IMMEDIATE, HORRIFIC, IN

21   MR. WATSON'S OWN WORDS, HORRIFIC EVENT.

22         THE COURT:  OKAY.  I'M SATISFIED ON THAT.  THANK YOU.

23         AND HOW ABOUT ON THE INVESTIGATION?

24         MR. PETERSEN:  YOUR HONOR, ON THE INVESTIGATION, THE

25   ISSUE IS THAT THE FACT THAT -- WE DO NOT DISPUTE THAT THERE WAS

1    A SUBPOENA ISSUED ON X DATE, WHATEVER THAT DATE WAS.  THE FACT

2    THAT A SUBPOENA WAS ISSUED DOES NOT, IN AND OF ITSELF, INDICATE

3    THAT THE INVESTIGATION OPENED, STARTED OR JUST WAS PENDING ON

4    THAT DATE.

5           THE COURT:  WELL, THAT'S NOT THE ISSUE, THE ISSUE IS

6    WHEN DID THE COMPANY KNOW?

7           MR. PETERSEN:  AND AGAIN, YOUR HONOR, WITH RESPECT TO

8    THAT ISSUE, I WILL BE FRANK WITH YOU THAT WE DO NOT HAVE

9    SPECIFIC FACTS BECAUSE IT'S A PRIVATE COMPANY, OBVIOUSLY

10    THERE'S BEEN NO DISCOVERY CONDUCTED TO DATE WITH RESPECT TO

11    THAT PENDING INVESTIGATION.

12           THE COURT:  AND SO IS THERE ANY CASE AUTHORITY YOU

13    CAN GIVE ME FOR RELAXATION OF THE 9(B) OBLIGATION ON THIS?

14           MR. PETERSEN:  YOUR HONOR, I BELIEVE IT WAS CITED IN

15    OUR PAPERS.  BEAR WITH ME ONE SECOND.

16           THE COURT:  I'M SORRY, I DON'T HAVE THAT AT MY

17    FINGERTIPS.

18           MR. SHAPIRO:  ON PAGE 15 OF PLAINTIFF'S OPPOSITION

19    TO, THIS WOULD BE OZY MEDIA'S MOTION TO DISMISS, THERE ARE

20    SEVERAL CASES CITED, ONE BEING IN RE SECURE COMPUTING CORP.

21    SECURITIES LITIGATION, 184 F.SUPP.2D, 980, 987 THROUGH 88.

22           THE COURT:  THANK YOU.  I WILL GO RIGHT TO THAT.  WE

23    CAN MOVE ON THEN.

24        THE LAST ONE IS THE MATERIAL ADVERSE EFFECT.  SO HERE, MY

25    CONCERN IS THAT THE LOSS OF A MAJOR INVESTOR AND A PROMINENT

1      INVESTOR IN GOLDMAN, CLEARLY COULD HAVE HAD A MATERIAL ADVERSE

2      EFFECT, BUT THAT WAS DISCLOSED.

3          SO THE ISSUE HERE IS THE FAILURE TO DISCLOSE THE REASON,

4      AND I BECOME VERY CONCERNED THAT WE ARE MOVING INTO THAT

5      PROBLEM I MENTIONED EARLIER.

6          MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

7          AND SO THE ISSUE I WOULD LIKE TO RAISE ON THAT IS IF YOU

8      GO TO, AND I'M SORRY, I'M OPENING THE SPA TO THAT SPECIFIC

9      SECTION RIGHT NOW.

10          THE COURT:  OKAY.

11          MR. PETERSEN:  THE DEFINITION OF MATERIAL ADVERSE

12      EFFECT, AS ARGUED IN THE PAPERS, AND I KNOW THIS IS DISPUTED BY

13      COUNSEL THOUGH, INCLUDES A MATERIAL ADVERSE EFFECT ON THE

14      COMPANY'S "FINANCIAL CONDITION OR BUSINESS AS NOW CONDUCTED."

15          THE ALLEGATIONS IN THE SECOND AMENDED COMPLAINT, TAKEN IN

16      THEIR ENTIRETY, FOR THE SAME REASONS REALLY IF YOU LOOK AT THE

17      ISSUE OF OUT OF THE ORDINARY COURSE, HAD -- ARE ALLEGED TO HAVE

18      HAD A MATERIAL ADVERSE EFFECT ON THE WAY THAT THE COMPANY DID

19      BUSINESS.  AND MOREOVER YOUR HONOR, ON THE COMPANY --

20          THE COURT:  OKAY.  AND WHAT IS THAT?  TELL ME WHAT

21      THAT IS.  WHERE DID YOU ALLEGE THAT?  I DON'T KNOW WHAT YOU ARE

22      SAYING -- WHAT FACTS DO YOU ALLEGE THAT SHOW THAT THIS AFFECTED

23      BUSINESS AS NOW CONDUCTED?  I DON'T UNDERSTAND.

24          MR. PETERSEN:  YOUR HONOR, IT GOES TO THE SAME ISSUE

25      THAT WE DISCUSSED WITH RESPECT TO THE SERIES D, TO THE SWITCH

1    TO SERIES C, AND ON THE FINANCIAL CONDITION ISSUE, YOUR HONOR,

2    WHICH IS ALSO A COMPONENT OF THE DEFINITION OR A PIECE OF THE

3    DEFINITION OF MATERIAL ADVERSE EFFECT, THE SAC ALLEGES THAT THE

4    VALUATIONS THAT WERE BEING FLOATED WERE $125 MILLION FOR THE

5    COMPANY.  THIS IS A $40 MILLION INVESTMENT.  THAT'S 30 PLUS

6    PERCENT OR MORE.

7              THE COURT:  YOU ARE RIGHT.

8              MR. PETERSEN:  AND SO READ IN ITS ENTIRETY, THE SAC

9    ALLEGES THAT THERE WAS A MATERIAL ADVERSE EFFECT ON THE FAILURE

10   OF GOLDMAN SACHS TO INVEST.  AND I UNDERSTAND YOUR HONOR'S

11   CONCERN --

12             THE COURT:  BUT THAT WAS DISCLOSED.

13             MR. PETERSEN:  BUT AGAIN, YOUR HONOR, IT GOES BACK TO

14   OUR THEORY THAT IT'S THE REASON FOR THE FAILURE TO INVEST,

15   WHICH OZY MEDIA, CARLOS WATSON AND SAMIR RAO, KNEW THE DAY IT

16   OCCURRED.  WE ARE NO T SAYING IT RENDERED EVERYTHING FALSE,

17   YOUR HONOR, WE ARE SAYING IT RENDERED VERY SPECIFIC AFFIRMATIVE

18   REPRESENTATIONS MADE TO LIFELINE.

19             THE COURT:  AND WHAT AFFIRMATIVE REPRESENTATION WOULD

20   THAT BE?

21             MR. PETERSEN:  THE AFFIRMATIVE REPRESENTATIONS WOULD

22   BE THE FOUR WE ARE TALKING ABOUT -- IT WOULDN'T BE THE FOUR, IT

23   WOULD BE THE MATERIAL ADVERSE --

24             THE COURT:  SO ARE YOU BRINGING IN THE SWITCH TO

25   SERIES C UNDER MATERIAL ADVERSE EFFECT AS WELL AS PART OF YOUR

1    THEORY?

2              MR. PETERSEN:  YES, YOUR HONOR.

3              THE COURT:  THAT YOU DIDN'T PLEAD.

4              MR. PETERSEN:  UNDERSTOOD.

5              THE COURT:  SO YOU NEED TO PLEAD THIS.  I'M NOT SURE

6    THAT GETS YOU THERE.  IT MIGHT MORE EASILY FIT UNDER THE OTHER

7    REPRESENTATION HERE.

8         SEE, THE PROBLEM I HAVE IS THAT IF THEY HADN'T DISCLOSED

9    GOLDMAN WITHDRAWAL, THAT WAS A BIG DEAL, THERE IS NO QUESTION,

10   BUT I DON'T SEE ANY FACTS HERE SHOWING THAT THERE WAS AN ADDED

11   MATERIAL ADVERSE EFFECT FROM THE FAILURE TO DISCLOSE THE REASON

12   THAT GOLDMAN WITHDREW.

13        BECAUSE I DON'T UNDERSTAND WHY OTHER SOPHISTICATED

14   INVESTORS WOULD CARE.  THEY WANT TO KNOW WHO IS IN AND WHO IS

15   OUT.  AND THE REASON FOR IT IS -- I MEAN, WOULD THEY EVEN

16   BELIEVE THE REASON?

17        TO ME, THIS IS A PANDORA'S BOX, AND I ACTUALLY DON'T THINK

18   IT GETS YOU ANYWHERE.  THIS ONE WOULD -- I'M NOT SURE YOU CAN

19   SUCCESSFULLY AMEND UNDER THIS.  BUT IF YOU WANT TO ALLEGE

20   THAT -- SO THE SWITCH TO SERIES C, OF COURSE, THAT'S NOT A --

21   THAT SWITCH, I DON'T THINK -- I'M NOT SURE THAT WORKS AT ALL.

22   I'M NOT REALLY UNDERSTANDING THIS THEORY.

23        AND AGAIN, THERE WAS A BIG IMPACT ON THE COMPANY BY LOSING

24   THAT GOLDMAN INVESTMENT, THAT'S HUGE.  BUT -- BECAUSE YOU ARE

25   NOT ACTUALLY SUGGEST THAT THE FAILURE TO DISCLOSE THAT A

1    COFOUNDER AND COO HAS EXPERIENCED A PSYCHOTIC BREAK, WHICH YOU

2    HAVE NOT ALLEGED, AND WE DON'T KNOW WHAT HAPPENED OR WHETHER

3    THAT WAS A PRANK OR WHETHER IT WAS A THOUGHT OUT SCHEME TO

4    DEFRAUD THAT HE WASN'T HAVING A PSYCHOTIC BREAK, HE ACTUALLY

5    WAS DOING THIS WITH SORT OF EYES WIDE OPEN AND MAY BE

6    SCURRILOUS, BUT NOT INSANE.

7         SO, YOU KNOW, I DON'T KNOW WHAT THAT IS, BUT YOU HAVEN'T

8    REALLY ALLEGED THAT THE FAILURE TO DISCLOSE A SIGNIFICANT

9    HEALTH PROBLEM OF A SENIOR EXECUTIVE, THAT COULD BE A PROBLEM,

10   BECAUSE THE WHOLE COMPANY COULD FALL APART WITHOUT THEIR

11   FOUNDER.

12        SO I DON'T KNOW WHERE YOU ARE GOING ON THIS.  I DON'T SEE

13   THE CONNECTION.  I DON'T SEE THE CAUSATION ISSUE HERE.

14            MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

15        AND I WOULD JUST ARGUE THAT AND ASK THE COURT TO LOOK BACK

16   AT THE DEFINITION OF MATERIAL ADVERSE EFFECT, WHICH IS IN

17   SECTION 3.1 OF THE -- OF BOTH SPA'S.  AND SPECIFICALLY THE PART

18   OR THE LANGUAGE IN THE DEFINITION THAT IT IS IN -- ON THE

19   MATERIAL ADVERSE EFFECT ON THE FINANCIAL CONDITION OR BUSINESS.

20            THE COURT:  AND THAT'S WHAT I DON'T SEE THAT YOU'VE

21   ALLEGED.  BECAUSE LOSS OF GOLDMAN WAS THE FINANCIAL HIT, AND

22   THAT WAS DISCLOSED.  WHY THEY LOST GOLDMAN DIDN'T CAUSE -- YOU

23   HAVEN'T ALLEGED THAT THE REASON GOLDMAN PULLED OUT CAUSED A

24   GREATER FINANCIAL HARM THAN THE MERE LOSS OF THE $40 MILLION

25   INVESTMENT.  THAT'S THE PROBLEM, I GUESS.

1          MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

2          AND I BELIEVE WHEN READ IN ITS ENTIRETY IN THE SAC, THAT

3     ALLEGATION IS THERE OR THAT THEORY IS PLED WITH RESPECT TO THE

4     SPECIFIC VALUATIONS THAT WERE BEING FLOATED.

5          THE COURT:  AND SO WHERE ARE YOU DIRECTING ME?

6          MR. PETERSEN:  YOUR HONOR, AGAIN THAT WOULD BE, I'M

7     SORRY, LET ME OPEN TO THE PARAGRAPHS OF THE COMPLAINT.  THAT

8     WOULD BE AT PARAGRAPHS 12 THROUGH 16, YOUR HONOR, 17.

9          THE COURT:  OKAY.

10          MR. PETERSEN:  AND I WILL STOP WITH THIS LAST POINT,

11     YOUR HONOR, THE MATERIAL ADVERSE EFFECT, IT IS A COMBINATION OF

12     BOTH AN IMPACT ON THE FINANCIAL CONDITION, GIVEN THE VALUATIONS

13     THAT ARE ALLEGED, AND IT IS ALSO NOT -- SORRY, LET ME SEE THE

14     SPECIFIC LANGUAGE IN 3.1.  AND IT'S CERTAINLY THE SWITCH FROM

15     SERIES D TO SERIES C, AND THE SCRAMBLING THAT THE COMPANY DID

16     FOLLOWING THE INCIDENT HAD AN ADVERSE EFFECT, MATERIAL ADVERSE

17     EFFECT ON THE BUSINESS AS NOW CONDUCTED, WHICH IS PART OF THE

18     DEFINITION OF MATERIAL ADVERSE EFFECT UNDER SECTION 3.1.

19          THE COURT:  ALL RIGHT.  I WANT YOU TO FINISH UP ON

20     THESE ISSUES, ECONOMIC LOSS AND LOSS CAUSATION AND MOTIVE.

21          SO MR. SHAPIRO STARTED BY SAYING REGARDLESS OF ALL OF THIS

22     THAT WE SPENT OUR TIME ON, THOSE ISSUES BAR YOU FROM BEING ABLE

23     TO AMEND.  SO I'M SORRY WE WAITED UNTIL THE END ON THOSE, BUT

24     LET'S TALK ABOUT MOTIVE, ECONOMIC LOSS AND LOSS CAUSATION.

25          MR. PETERSEN:  YOUR HONOR, AS NOTED IN OUR PAPERS,

1    MOTIVE IS NOT A REQUIREMENT.  DESPITE WHAT MR. SHAPIRO SAID,

2    THERE IS CASE LAW THAT INDICATES, AND I BELIEVE YOUR HONOR

3    INDICATED AT THE LAST HEARING ON THE FIRST AMENDED COMPLAINT,

4    THE MOTION TO DISMISS, THAT MOTIVE IS NOT A HARD REQUIREMENT

5    WHEN THERE IS AN INFERENCE AS TO SCIENTER THAT CAN BE DRAWN.

6         AND YOUR HONOR, THE MOTIVE HERE THAT IS ALLEGED IS THAT IT

7    WAS MR. WATSON'S COMPANY, IT WAS MR. RAO'S COMPANY, BOTH OF

8    THEM AS COFOUNDERS, AS OFFICERS, AS DIRECTORS, AND WHAT THIS

9    INCIDENT LEAD TO, IT PUT THE VIABILITY OF THE ENTIRE COMPANY,

10   OF THEIR ENTIRE INVESTMENT, OF THEIR ENTIRE WORK AT ISSUE.

11        AND I KNOW THAT THE DEFENDANTS ARGUE AT LENGTH THAT WE

12   SHOULD NOT BE ABLE TO RELY ON THE OCTOBER 5TH, 2021 STATEMENT,

13   SO WE CAN'T PLEAD IN HINDSIGHT, BUT YOUR HONOR, WE ARE NOT

14   ATTEMPTING TO PLEAD IN HINDSIGHT.  WHAT THE PURPOSE OF THE

15   ALLEGATIONS OF MR. WATSON'S ADMISSIONS REGARDING THESE

16   INCIDENTS ON OCTOBER 5TH ON A NATIONALLY BROADCASTED RADIO

17   SHOW, IS CONTEXTUAL.  IT SHOWS THE STATE MIND OF MR. WATSON AS

18   THIS EVENT IS OCCURRING.  WHETHER HE SAID THIS PUBLICLY, THE

19   DAY OF THE EVENT, OR ON OCTOBER 5TH, THE STATEMENTS ARE

20   MR. WATSON'S STATE OF MIND AT THAT TIME.  HE SPECIFICALLY MAKES

21   THESE REPRESENTATIONS OR THESE STATEMENTS, EXCUSE ME, ON THE

22   RADIO SHOW IN THE PAST TENSE.  I KNEW THE DAY OF.  I

23   IMMEDIATELY CALLED.

24        SO IT IS NOT PLEADING IN HINDSIGHT, IF ANYTHING, IT IS

25   SHOWING THE STATE OF MIND AND THE SCIENTER OF MR. WATSON AND

1     THE COMPANY AT THE TIME.

2          AND AGAIN, IT IS NOT -- THE MOTIVE IS SURVIVAL OF THIS

3     COMPANY.  AND IT PLAYED OUT THAT THIS COMPANY WAS ABOUT TO

4     SHOUT DOWN, YOUR HONOR, THAT'S HOW SERIOUS THIS WAS.  SO

5     MR. WATSON'S STATEMENTS ON OCTOBER 5TH ARE REFLECTIVE OF THE

6     MINDSET, STATE OF MIND, AND HIS MOTIVE TO CHANGE FROM SERIES D

7     TO SERIES C TO NOT DISCLOSE THE REASON FOR THEIR LACK OF THE

8     GOLDMAN INVESTMENT TO LIFELINE, IT'S THE VIABILITY OF THE

9     COMPANY AT STAKE.

10          THE COURT:  WELL, AS MR. SHAPIRO ARGUES IN HIS REPLY,

11     ALL COMPANIES ARE ON DEATH'S DOORSTEP AS THEY GET STARTED, AND

12     THEY ALL TRY TO -- THEY ALL TRY TO BE MAGICIANS AND DO WHAT

13     THEY NEED.  THEY HAVE TO STAY WITHIN THE CONFINES OF THE LAW,

14     CERTAINLY, BUT I DON'T THINK MOTIVE IS TRYING TO SAVE THE

15     COMPANY.  I THINK MOTIVE REALLY HAS TO DO WITH PERSONALLY

16     ENRICHING ONE'S SELF.  AND THAT'S WHAT YOU HAVEN'T SEPARATED

17     HERE.

18          MR. PETERSEN:  AND YOUR HONOR, PART OF THE PROBLEM

19     HERE IS IT'S A PRIVATE COMPANY.  IT IS NOT PUBLICLY DISCLOSED

20     THAT CARLOS WATSON HAS TEN PERCENT, FIVE PERCENT,

21     FIFTY PERCENT, SIXTY PERCENT.  AND SO THE FACT THAT THAT

22     INFORMATION IS NOT READILY AVAILABLE TO THE INVESTING PUBLIC IN

23     THIS PRIVATE COMPANY, SHOULDN'T BE A DEATH KNELL ON THE MOTIVE

24     ISSUE, BECAUSE MR. WATSON, IT'S HIS COMPANY, THERE'S NO DISPUTE

25     ABOUT THAT, HE WAS THE CEO, HE WAS THE PRESIDENT, HE WAS THE

1    BOARD OF -- HE WAS ON THE BOARD OF DIRECTORS, AND WE BELIEVE

2    READ IN ITS ENTIRETY, THAT DEMONSTRATES THAT MR. WATSON HAD A

3    SUFFICIENT STAKE IN THIS COMPANY THAT WOULD PROVE THE MOTIVE.

4        AND I UNDERSTAND AND I ACKNOWLEDGE THAT IN THE REPLY

5    THERE'S A CASE THAT TALKS ABOUT THIRTY-ONE PERCENT, OR

6    SOMETHING TO THAT EFFECT, THAT'S DIFFERENT THAN THIS SCENARIO,

7    BECAUSE IN THIS SCENARIO WE DON'T HAVE ACCESS TO THAT

8    INFORMATION.  BUT HAVE ADEQUATELY ALLEGED THAT MR. WATSON HAD A

9    SUBSTANTIAL STAKE IN THE COMPANY.

10       AND YOUR HONOR, ON THE ISSUE OF LOSS CAUSATION, THE CASES

11   ARE CLEAR THAT RECISION IS A LOSS CAUSATION, OR YOU CAN PROVE

12   LOSS CAUSATION, OR EXCUSE ME, ALLEGED LOSS CAUSATION THROUGH

13   RECISION.  THAT'S SET FORTH IN -- I'M SORRY, YOUR HONOR, GIVE

14   ME ONE SECOND -- IN THE RANDALL CASE IN THE BLACKEY CASE, THE

15   COURT HAS, THERE SPECIFICALLY CONCLUDED THAT THE COURT HAS

16   DISCRETION TO PERMIT RECISION WHERE POSSIBLE.

17       THIS IS A SITUATION WHERE IT'S POSSIBLE, YOUR HONOR.

18           THE COURT:  BUT RECISION IS A REMEDY, BUT IS IT PROOF

19    OF THE ECONOMIC HARM.  I THINK THAT WAS MR. SHAPIRO'S POINT.

20           MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

21       AND THE PROOF OF THE ECONOMIC HARM IS ALLEGED SPECIFICALLY

22   AS $2.25 MILLION PLUS INTEREST, YOUR HONOR.  THE HARM IS THAT

23   LIFELINE PARTED WITH $2.25 MILLION, AND GAVE THAT MONEY TO OZY

24   MEDIA.  THAT IS THE LOSS.

25       IT ONLY DID SO AS -- AND IT'S SPECIFICALLY ALLEGED IN THE

1    COMPLAINT NUMEROUS TIMES, BECAUSE IT DID SO RELYING ON THE

2    SPA'S.

3              THE COURT:  WELL, THAT WOULD BE THE OUTSIDE OF ITS

4    LOSS, BUT IS THEIR INVESTMENT COMPLETELY WORTHLESS NOW?  OZY IS

5    STILL A GOING ENTITY.

6              MR. PETERSEN:  YOUR HONOR, AGAIN -- GO AHEAD, I'M

7    SORRY, YOUR HONOR.

8              THE COURT:  SO IF MR. SHAPIRO IS RIGHT, AND I

9    ACTUALLY THINK HE IS, THAT RECISION CAN BE A MEASURE OF THE

10   AMOUNT OF DAMAGES, BUT YOU HAVEN'T EVEN ALLEGED THAT THIS

11   INVESTMENT HAS LOST VALUE.

12             MR. PETERSEN:  YOUR HONOR, THAT'S -- IN THE CASES AS

13   THEY ARE CITED, THAT'S TYPICALLY THE REQUIREMENT IN A PUBLIC

14   SECURITIES CONTEXT.  THIS IS NOT A PUBLIC COMPANY.

15             THE COURT:  OH, I UNDERSTAND.

16             MR. PETERSEN:  SO AGAIN, WE GET TO THE ISSUE OF WHAT

17   IS IT WORTH, IT'S A PRIVATE COMPANY, LIFELINE IS NOT PRIVY TO

18   THE INFORMATION AS TO WHAT ITS INVESTMENT, WHICH WAS AS

19   ALLEGED, UNDER FALSE PRETENSES OR NOT FULLY DISCLOSED

20   INFORMATION, DEPARTED WITH $2.25 MILLION.

21       AND THAT IS ITS HARM, AS ALLEGED.  WE ARE NOT ALLEGING A

22   LOSS, A DIFFERENCE BETWEEN THE VALUATION OR THE MONEY AND THE

23   VALUATION, BECAUSE WE DON'T HAVE ACCESS TO THAT INFORMATION IN

24   OUR PRIVATE COMPANY, YOUR HONOR.

25             THE COURT:  OKAY.

1          MR. PETERSEN:  AND THEN YOUR HONOR -- I BELIEVE

2     UNLESS YOUR HONOR HAS ANY OTHER SPECIFIC ISSUES TO OZY MEDIA OR

3     WATSON, I CAN TURN TO MR. RAO.

4          THE COURT:  WHY DON'T YOU GO AHEAD AND TURN TO

5     MR. RAO.  I WILL LET THEM HAVE THE LAST WORD, AND I DO HAVE AN

6     11:00 CASE MANAGEMENT, SO WE WILL HOPE TO BE PRETTY CLOSE ON

7     THAT.  LET'S TURN TO MR. RAO.

8          MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

9          THE LAST POINT ON OZY AND MR. WATSON, WE WOULD, AS WE HAVE

10    SAID THROUGHOUT, REQUEST LEAVE TO AMEND TO ADDRESS THE ISSUES

11    YOUR HONOR HAS RAISED.

12         WITH RESPECT TO MR. RAO, AGAIN, IT'S CHERRY PICKING

13    ALLEGATIONS.  WHEN READ IN ITS ENTIRETY, IT'S IMPLAUSIBLE TO

14    CONCLUDE THAT MR. RAO DID NOT KNOW WHAT WAS IN THE SPA'S.  WE

15    CAN MAKE FACTUAL ALLEGATIONS THAT MR. RAO DISCUSSED THE

16    SPECIFICS OF THE SPA'S, IF THAT'S WHAT THE COURT WOULD REQUIRE.

17         WITH LIFELINE, HE SENT THE E-MAILS, HE WAS THE COO, A

18    DIRECTOR, A FOUNDER.  HIS JOB, AS ALLEGED IN THE SAC, WAS TO GO

19    AND SOLICIT INVESTMENTS USING THESE SPA'S.  IT IS ENTIRELY

20    IMPLAUSIBLE TO CONCLUDE THAT HE DID NOT KNOW WHAT WAS IN THE

21    SPA'S.

22         AND THERE'S NO REQUIREMENT IN THE CASES THAT SAY THAT

23    MR. RAO NEEDED TO READ EVERY SPECIFIC WORD IN THE SPA'S OR

24    EVERY SPECIFIC PROVISION IN THE SPA'S.  HE WAS OUT THERE

25    SOLICITING INVESTMENTS, SPA'S IN HAND.  IT IS IMPLAUSIBLE TO

1    CONCLUDE THAT HE DIDN'T KNOW WHAT WAS IN THOSE SPA'S, GIVEN HIS

2    POSITION IN THE COMPANY.

3          THE COURT:  WELL, I GUESS WHAT I'M REALLY STRUCK

4    WITH, IT'S REALLY HARD TO DRAW LINES BETWEEN YOUR -- THE FACTS

5    THAT YOU -- AS YOU ALLEGE THEM, AND THE MISLEADING NATURE OF

6    THESE SPA'S.  I HAVE TO REALLY -- IT MAKES MY HEAD HURT A

7    LITTLE BIT TO SEE WHETHER THERE'S EVEN CAUSATION FOR ANY OF

8    THIS AT ALL.

9          AND SO THE DISSEMINATION THEORY, I DON'T KNOW THAT IT'S

10   ANY WEAKER THAN THE CASE ITSELF.  I AM GOING TO LET YOU AMEND,

11   I THINK THIS IS A REAL STRETCH.  I'M NOT THE FACT FINDER IN

12   THESE CASES, I'M JUST LOOKING AT A THRESHOLD FOR YOU TO GET

13   PAST THE PLEADING STAGE, WHICH IS A HIGH ONE HERE.  AND THEN AT

14   THAT POINT, WELL, WE GO FROM THERE.

15         MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

16         THE COURT:  OKAY.  YOU KNOW, LORENZO HAD GOOD FACTS,

17   I WANT TO SAY, BECAUSE HE ADMITTED HE KNEW IT WAS FALSE.

18         SO THAT WAS -- AND I DON'T THINK THE SUPREME COURT MEANT

19   TO SET THE LEVEL THAT HIGH, BUT I DON'T KNOW HOW MUCH LOWER

20   IT'S BEEN SET.

21         MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

22         THE COURT:  OKAY.

23         LET ME TURN BACK THEN.  MR. SHAPIRO, AND MR. GUGELMANN,

24   I'M GOING TO LET YOU HAVE THE LAST WORD ON YOUR MOTIONS.

25         MR. SHAPIRO:  YES, YOUR HONOR.  THANK YOU.  IF I

1    COULD START.

2         I THINK IT'S CLEAR THAT THE LAW DOESN'T DISTINGUISH

3    BETWEEN PRIVATE COMPANIES AND PUBLIC COMPANIES WITH REGARD TO

4    THE REQUIREMENTS, AND THE PARTICULARITY REQUIREMENTS OF THE

5    STATUTORY HURDLE HERE.

6         SO WHATEVER DIFFICULTIES COUNSEL MAY ENCOUNTER, THE LAW

7    DOESN'T WAIVE THE PARTICULARITY REQUIREMENTS FOR PRIVATE

8    COMPANIES.

9         SO I THINK THEY HAVE ALREADY CONCEDED THEY DON'T HAVE THE

10   LOSS CALCULATION THAT'S NECESSARY TO PLEAD IN A CASE LIKE THIS.

11   WE WOULD ARGUE, OF COURSE, THAT THEY DON'T MEET ANY OF THE

12   OTHER ELEMENTS EITHER.

13        WITH RESPECT TO SCIENTER, ALSO, THEY ARE RELYING ON A

14   SOUTHERN DISTRICT OF CALIFORNIA CASE, NEBORSKY.  WE HAVE

15   DISTINGUISHED THAT IN OUR PAPERS.  AGAIN, I DON'T THINK THAT'S

16   CONSISTENT WITH NINTH CIRCUIT LAW ON MOTIVE.  WE HAVE EXPLAINED

17   WHY.

18        AND AGAIN, I THINK THE DIFFERENCE COMES DOWN TO, THERE'S

19   NO DISTINCTION BETWEEN A PRIVATE COMPANY -- HOLDINGS IN A

20   PRIVATE COMPANY AND SOME OTHER KIND OF HOLDING IN A PUBLIC

21   COMPANY.  AND FRANKLY, ULTIMATELY THERE HAS TO BE A SPECIFIC

22   PECUNIARY MOTIVE THAT'S DISTINCT FROM THE BROAD CORPORATE

23   MOTIVES OF THE COMPANY.

24        AS THE COURT POINTED OUT, THIS THEORY THAT THE SWITCH FROM

25   SERIES D TO SERIES C WAS OUT OF THE ORDINARY COURSE VIOLATION,

1    THAT'S NOT PLED, IT DOESN'T EVEN HOLD WATER, YOUR HONOR.  TO BE

2    PERFECTLY HONEST WITH YOU, OVERALL I THINK HOW THE COMPANY

3    CONDUCTS ITS INVESTMENTS AND SOLICITS INVESTMENTS IS NOT WHAT'S

4    COVERED IN THE REPRESENTATION ABOUT ORDINARY COURSE OF THE

5    BUSINESS.

6        I DON'T THINK YOU CAN ENCOMPASS WHAT'S GOING ON, VIS A VI

7    INVESTORS, INTO THAT REPRESENTATION.  THAT'S WHAT THEY ARE

8    TRYING TO DO HERE WITH THIS LAST MINUTE TURN OF ARGUMENTATION.

9        AND THE OTHER THING IS THAT I THINK IT'S IMPORTANT TO

10   DISTINGUISH A COUPLE OF THINGS.  THE REPRESENTATIONS IN THE SPA

11   ARE THE MATERIAL ELEMENTS HERE.  WHAT HAPPENED WITH GOLDMAN,

12   THE ISSUE THERE WAS, WAS THERE SOME EVENT AT THE COMPANY THAT

13   THEY MIGHT HAVE CONCLUDED WHEN THEY SIGNED THE SPA'S, HAD A

14   MATERIAL ADVERSE EFFECT ON THE COMPANY.

15       WE ARGUED EFFECTIVELY IN THE ALTERNATIVE THAT THE

16   DISCLOSURE OF THE GOLDMAN INVESTMENT TOOK CARE OF THAT ISSUE.

17   BUT I WOULD ALSO ARGUE, JUST FOR STRICT PURPOSES, THAT WHETHER

18   OR NOT A COMPANY INVESTS IN THE COMPANY, I WOULD ARGUE THAT

19   THAT'S NOT NECESSARILY WHAT'S ENCOMPASSED BY THE CONCEPT OF A

20   MATERIAL ADVERSE EFFECT.

21       BUT BE THAT AS IT MAY, WHETHER IT IS OR ISN'T, THEY

22   DISCLOSED THAT FACT, SO THEY HAD EVERYTHING AT THEIR

23   FINGERTIPS.

24       AS THE COURT POINTED OUT, THE REASON FOR THAT IS GOING

25   WELL BEYOND THE SCOPE OF WHAT'S NECESSARY IN THAT

1     REPRESENTATION.  THEY HAVE NO OTHER SUPERVENING DUTY TO

2     DISCLOSE, APART FROM WHAT'S IN THE SPA'S THEMSELVES.  SO THE

3     QUESTION IS, AS THE COURT POINTED OUT, DOES AN ADDITIONAL

4     DISCLOSURE ABOUT THE REASONS HAVE ANY RELEVANCE TO THE MATERIAL

5     ADVERSE EFFECT REPRESENTATION, AND WE WOULD ARGUE IT DOESN'T,

6     AND THAT THEY HAD THE HEART OF THE ISSUE IN FRONT OF THEM.

7          THE COURT:  AS I RECALL IN THE LAST GO AROUND, THE

8     ALLEGATION WAS THAT -- I MAY BE MISREMEMBERING THAT IN

9     SOLICITING THE INVESTMENT FROM LIFELINE, IT HAD BEEN TOUTED

10    THAT GOLDMAN WAS COMING ON BOARD WITH THIS BIG INVESTMENT, THUS

11    MAKING IT -- ONCE THEY KNEW GOLDMAN WAS OUT, THEN THEY WOULD

12    HAVE A DUTY TO DISCLOSE THAT GOLDMAN WAS OUT.

13        NOW THAT'S NOT THE ALLEGATION, NOW IT'S JUST THE SPA

14    ITSELF, WHICH SAYS NOTHING ABOUT GOLDMAN.

15         MR. SHAPIRO:  CORRECT, YOUR HONOR.  I THINK THAT'S

16    THE PROPER ANALYSIS.

17        THE OTHER THING I WANT TO POINT OUT IS IN THE METZGER

18    DECISION, IN THE NINTH CIRCUIT, ONCE THE PLAINTIFF HAS HAD TWO

19    BITES AT THE APPLE, THE COURT'S DISCRETION IS BROAD.  IT

20    STATES, AS THE COURT STATES, THE DISTRICT COURT'S DISCRETION TO

21    DENY LEAVE TO AMEND IS PARTICULARLY BROAD WHERE PLAINTIFF HAS

22    PREVIOUSLY AMENDED THE COMPLAINT.

23        SO THE NINTH CIRCUIT HAS ALREADY GIVEN BROAD DISCRETION TO

24    THE DISTRICT COURT TO DENY LEAVE TO AMEND.  AND AGAIN, I DON'T

25    THINK WE HAVE HEARD ANYTHING HERE IN ARGUMENT THAT SUGGESTS

1    THAT A REVISED PLEADING IS GOING TO GET THEM ANY CLOSER TO THE

2    GOAL.

3              THE COURT:  OKAY.  THANK YOU.

4         MR. GUGELMANN, LET ME GIVE YOU AN OPPORTUNITY TO MAKE SOME

5    CLOSING REMARKS.

6              MR. GUGELMANN:  THANK YOU, YOUR HONOR.

7         I WANT TO MAKE ONE POINT ABOUT THIS NEW THEORY OF SERIES D

8    VERSUS SERIES C BEING NOW THE ACTIONABLE ISSUE.  I THINK THE

9    COURT'S POINTS ARE VERY WELL TAKEN, THE COURT'S CONCERN ABOUT

10   OPENING THIS PANDORA'S BOX OF WHY GOLDMAN WITHDREW AS OPPOSED

11   TO JUST DISCLOSING THE FACT THAT GOLDMAN WITHDREW, AND WE ARE

12   WALKING INTO THE EXACT SAME ISSUE HERE WITH THE SERIES D VERSUS

13   SERIES C.

14        THE COMPLAINT IS VERY CLEAR THAT LIFELINE KNEW EXACTLY

15   THAT THEY WERE BEING OFFERED SERIES D INVESTMENT AT A CERTAIN

16   VALUATION, THAT THEY WERE THEN TOLD OKAY, WE ARE GOING TO DO

17   SERIES C, WE ARE GOING TO OPEN SERIES C AT A NEW VALUATION.

18        AND NOW THEY ARE SAYING WELL, WHAT WE ACTUALLY NEEDED TO

19   KNOW IS WHY ARE WE DOING THAT.  FULLY DISCLOSED AS TO WHAT THEY

20   WERE DOING, JUST AS WITH THE GOLDMAN WITHDRAWAL.  AND THEY ARE

21   SAYING, BUT THE MISREPRESENTATION IS THAT YOU DIDN'T TELL US

22   WHY YOU DID THAT.  AND I THINK THAT WALKS INTO THE EXACT SAME

23   CONCERNS THE COURT HAS ARTICULATED REPEATEDLY ABOUT THE GOLDMAN

24   WITHDRAWAL.

25        AND JUST TURNING BRIEFLY TO THE DISSEMINATION ISSUE WITH

```
1     MR. RAO.  I THINK THE TELLING REMARK IN COUNSEL'S ARGUMENT HERE

2     IS THAT THERE'S NO ALLEGATION THAT THE SPA'S WERE RENDERED

3     FALSE IN THEIR ENTIRETY.  WHAT COUNSEL SAID IS THAT THERE ARE

4     VERY SPECIFIC AFFIRMATIVE REPRESENTATIONS HERE THAT WERE

5     RENDERED FALSE.

6          AND SO IF PLAINTIFF IS GOING TO HAVE LEAVE TO AMEND AS TO

7     MR. RAO ON THIS REPRESENTATION THEORY, I WOULD SUBMIT IT IS NOT

8     ENOUGH TO SAY MR. RAO HAD SOME GENERAL KNOWLEDGE, MR. RAO MIGHT

9     HAVE DISCUSSED A TERM WITH PLAINTIFFS.  PLAINTIFFS HAVE TO SHOW

10    THAT HE KNEW WHAT WAS IN THOSE VERY SPECIFIC AFFIRMATIVE

11    MISREPRESENTATIONS THAT ARE AT ISSUE HERE.

12         AND I THINK -- I'M FRANKLY JUST PUZZLED BY THE ARGUMENT

13    THAT PLAINTIFFS HAVE NO OBLIGATION TO SHOW THAT HE KNEW WHAT

14    WAS IN THE PROVISIONS THAT THEY ARE SAYING HE KNOWINGLY

15    DISSEMINATED, UNDERSTANDING THAT THEY WERE FALSE.

16         I JUST DON'T UNDERSTAND, FRANKLY, HOW THAT WORKS.  I DON'T

17    UNDERSTAND HOW YOU CAN SAY, WE DON'T HAVE TO ALLEGE THAT HE

18    READ THIS, WE CAN JUST SAY IT WAS FALSE, AND SO HE'S AT FAULT

19    FOR IT.

20         SO THAT'S -- THAT WOULD BE MY COMMENT ON THIS POINT OF

21    REPLEADING AS TO MR. RAO AND DISSEMINATION.  I DON'T THINK IT'S

22    ENOUGH TO JUST SAY THAT HE HAD SOME GENERAL KNOWLEDGE HE MIGHT

23    HAVE DISCUSSED SOME TERMS OF THE INVESTMENT.  I THINK WHAT THEY

24    HAVE TO SHOW IS HE HAD KNOWLEDGE OF THESE SPECIFIC

25    REPRESENTATIONS.
```

```
1              THE COURT:  OKAY.

2              MR. SHAPIRO:  YOUR HONOR, IF I MAY, I HAVE ONE MORE

3       POINT I JUST WANTED TO FIT IN HERE I OMITTED TO SAY.

4              COUNSEL ARGUED THAT THE STATEMENT THAT MR. WATSON MADE IN

5       OCTOBER, HE MADE TWO STATEMENTS, ONE IS THE EFFECT WAS HORRIFIC

6       AND THEN HE REPORTED IT TO THE BOARD, AND THAT HE HAS BEEN

7       ASKED TO LEAVE, IN THE PAST TENSE.

8              THAT THAT'S ENOUGH TO INFER THAT HE KNEW OF AN IMPENDING

9       RESIGNATION IN FEBRUARY AND/OR MAY OF THAT YEAR.  I DON'T THINK

10      THAT'S ENOUGH TO GET THERE, YOUR HONOR, THAT'S AN INFERENCE

11      FROM THE USE OF THE PAST TENSE, WHICH IS REALLY NOT PLEADING

12      WITH PARTICULARITY ABOUT HIS STATE OF MIND AT THE TIME THAT HE

13      SIGNED THEM.

14             BUT MOREOVER, THE INFERENCE IS THAT OH, HE MUST HAVE

15      GOTTEN RID OF MR. RAO.  BUT WE KNOW FROM THE ALLEGATIONS IN THE

16      COMPLAINT THAT MR. RAO WAS STILL IN THE MIX, STILL WORKING FOR

17      THE COMPANY FROM FEBRUARY THROUGH MAY, AND CONTINUED TO

18      INTERACT WITH LIFELINE.

19             SO IT'S CLEAR THAT MR. RAO DID NOT LEAVE THE COMPANY

20      BETWEEN FEBRUARY AND MAY.  AND SO THEIR ALLEGATIONS BELIE THE

21      INFERENCE THAT THEY ARE TRYING TO ESTABLISH THERE.

22             THE COURT:  OKAY.

23      THANK YOU, THAT'S HELPFUL.

24             ALL RIGHT.  SO A COUPLE OF THINGS.  FIRST OF ALL, IF I

25      GRANT LEAVE TO AMEND, AND I'M NOT PROMISING THAT, MR. PETERSEN,
```

1    I WANT TO GIVE YOU ENOUGH TIME BECAUSE THIS WOULD TRULY BE OUR

2    LAST TIME.  SO I WANT TO GIVE YOU ENOUGH TIME TO DO THAT.

3         I'M NOT GOING TO GET THIS ORDER OUT IN THE NEXT DAY OR SO,

4    CERTAINLY I'VE GOT A LOT OF WORK HERE.  BUT THE DATE I ISSUE

5    THE ORDER, HOW MUCH TIME WOULD YOU LIKE?

6         MR. PETERSEN:  YOUR HONOR, 30 DAYS WOULD BE FINE.

7         THE COURT:  OKAY.  THAT'S GOOD.

8         THE OTHER THING, AND THIS IS -- WHEN I OPENED UP TWO FULL

9    BRIEFS FROM THE TWO PARTIES, I WAS DISAPPOINTED IN MYSELF,

10   BECAUSE I NORMALLY WOULD HAVE TOLD YOU, AND I WILL TELL YOU

11   NOW, NO MATTER HOW MANY SEPARATE LAWYERS THERE ARE, YOU SHARE

12   THE PAGE LIMITS.

13        SO IF I GRANT LEAVE TO AMEND, AND IF THERE IS FURTHER

14   MOTION PRACTICE, THE COMBINED OPENING BRIEFS ARE GOING TO BE

15   25 PAGES, THE COMBINED RESPONSE IS GOING TO BE 25, AND THE

16   COMBINED REPLY WILL BE 15 PAGES.

17        SO I -- YOUR BRIEFING WAS EXCELLENT, I AM NOT CRITICAL OF

18   ANY OF IT.  I DON'T NEED ALL OF THAT, AND I'M NOT ASKING,

19   MR. GUGELMANN AND MR. SHAPIRO AND MS. WEST TO SHARE A COMMON

20   BRIEF, YOU CAN SEPARATE, YOU ARE JUST SHARING PAGE LIMIT, OKAY.

21        AND YOU KNOW, IF THEY GO OVER THE PAGE LIMITS, I STRIKE

22   THE ONE THAT'S FILED SECOND.  SO JUST KEEP THAT IN MIND.

23        ANYWAY, I HAVE TO REALLY THINK ABOUT -- I'M PRETTY CLEAR,

24   MR. PETERSEN, ON WHAT IS DEFICIENT, AND I HAVE TO REALLY THINK

25   ABOUT I'M GOING TO GIVE YOU LEAVE TO AMEND.

1          MR. PETERSEN:  UNDERSTOOD, YOUR HONOR.

2          THE COURT:  I'M JUST NOT PREPARED TO MAKE ANY PROMISE

3     THERE.  THIS IS AN UNUSUAL CASE.  I MEAN, A LOT OF SECURITIES

4     CASES LOOK PRETTY SIMILAR, AND YOU ALL ARE EXPERTS IN THIS

5     FIELD, AND THIS ONE DOESN'T, SO I REALLY HAVE TO GIVE IT SOME

6     THOUGHT.

7          OKAY.  THANK YOU.  I REALLY APPRECIATE THE EXCELLENT

8     ARGUMENT.  IT WAS VERY HELPFUL TO ME.

9          MR. PETERSEN:  THANK YOU, YOUR HONOR.

10          MR. SHAPIRO:  THANK YOU, YOUR HONOR.

11          MR. GUGELMANN:  THANK YOU.

12     (THE PROCEEDINGS WERE CONCLUDED AT 11:01 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 11/21/22